Edward OLVERA, Carla De Rose, Individually and as Guardian Ad Litem for AND–O, CHD–O, COD–O, SD–O, AGD–O, GD–O, RD–O, minor children, Susan Morrison, Kelly Meis, Plaintiffs,

v.

COUNTY OF SACRAMENTO, Jeanine Lopez, Fermine Perez, Jennifer Cullivan, Bryan Jones, Robin Rogers, Keeva Pierce, Veronica Carillo, Stephanie Lynch, Lynn Frank, Solla, Laura Coulthard, and Does 1 through 20, Defendants.

No. CIV. 2:10–550 WBS CKD.

United States District Court,
E.D. California.

March 19, 2013.

Dennis Ingols, Robert Ross Powell, Brett O. Terry, Law Offices of Robert R. Powell, San Jose, CA, Ronald R. Haven, Shepard and Haven, LLP, Sacramento, CA, for Plaintiffs.

Mark Peter O'Dea, Longyear, O'Dea & Lavra, LLP, Carol A. Wieckowski, Cathleen Janel Fralick, Daniel P. Jay, Evans, Wieckowski & Ward, Sacramento, CA, for Defendants.

*ORDER RE: MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO APPOINT GUARDIAN AD LITEM*

WILLIAM B. SHUBB, District Judge.

Plaintiffs brought this civil rights action under 42 U.S.C. § 1983 against defendants the County of Sacramento, the Department of Health and Human Services ("DHHS"), Child Protective Services ("CPS"), CPS employees, and Sacramento County counsel based on an investigation by CPS and the removal of a minor child from plaintiffs Edward Olvera and Carla DeRose's home. Presently before the court are two motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 and plaintiffs' motion to appoint a guardian ad litem for the minor children plaintiffs pursuant to Rule 17.

## I. *Factual and Procedural Background*

Plaintiffs and spouses Olvera and DeRose are licensed marriage and family therapists and are the natural parents of minor plaintiff RD–O. As of December 2008, Olvera and DeRose were the adoptive parents of minor plaintiffs SD–O, COD–O, and GD–O, were in the process of adopting minor plaintiffs AGD–O and AND–O, and had filed an incomplete adoption request for the adoption of minor plaintiff CHD–O. Until Olvera and DeRose adopted CHD–O on May 24, 2010, his adoptive parents were plaintiffs Susan Morrison and Kelley Miess.

In 2006, Olvera and DeRose began a therapeutic program in their home for adopted children suffering from severe emotional, psychological, and behavioral disorders in which the children lived in the Olvera/DeRose home and received treatment and education. In November 2007, Olvera and DeRose purchased a larger home and enrolled more children in their full-time, in-home program.

In December 2008, CPS received a report from a mandatory reporter that a child named Russell claimed he was subject to abuse when he previously lived in the Olvera/DeRose home. Based on this report, CPS began an investigation and the case was assigned to defendant Jeannine Lopez. On December 19, 2008, Lopez interviewed several children living in the Olvera/DeRose home at their school and, later that evening, went to the Olvera/DeRose home with defendant Claudia Solla and two police officers to interview other children residing at the home. Plaintiffs allege that the interviews on December 19, 2008, were performed without consent in violation of the Fourth Amendment. Defendant Wendy Christian, a CPS employee, also returned to the Olvera/DeRose home on January 6, 2009, and allegedly entered the home without consent in violation of the Fourth Amendment.

Based on Lopez's investigation and discussions during several "staffings" with CPS employees and County counsel, it was decided that Lopez would seek a protective custody warrant for the removal of AGD–O, AD–O, and CHD–O from the Olvera/DeRose home. To seek the removal of CHD–O, Lopez began drafting an application for a protective custody warrant ("PCW"), which may have been edited by defendant Eva Schrage and County counsel defendants Lisa Travis and Christopher Guillon. Plaintiffs allege that the PCW for the removal of CHD–O contained misrepresentations and omitted exculpatory evidence in violation of the Fourth Amendment. The juvenile court ultimately issued a protective custody warrant for the removal of CHD–O, but denied the applications for protective custody warrants for the removal of AGD–O and AD–O.

Pursuant to the protective custody warrant, CHD–O was removed from the Olvera/DeRose home on February 5, 2009, and placed in foster care while contested detention hearings were conducted. Ultimately, a settlement agreement was reached in which CHD–O was allowed to return to the Olvera/DeRose home under certain conditions.

In their Third Amended Complaint ("TAC"), plaintiffs assert the following eight claims:

1) the minor children plaintiffs' § 1983 claim against Lopez and Solla based on violations of their Fourth Amendment rights;

2) CHD–O's § 1983 claim against all defendants based on violation of his Fourth Amendment right;

3) all plaintiffs' § 1983 claim against all defendants based on violations of their Fourteenth Amendment rights to familial association caused by the removal of CHD–O from the Olvera/DeRose home without procedural due process;[1]

4) all plaintiffs' § 1983 claim against all defendants based on violations of their Fourteenth Amendment rights to familial association caused by the continued detention of CHD–O and "conspiracy to commit fraud upon the juvenile court and abuse the lawful processes of the court through repeated submissions of false evidence, misrepresentation, and the withholding of exculpatory evidence" without procedural due process, (Third Am. Compl. ¶ 157 (Docket No. 75));

5) all plaintiffs' § 1983 claim against all defendants based on violations of their First Amendment rights of association;

---

**1.** At oral argument, plaintiffs confirmed that their third and fourth claims are limited to alleged denials of procedural due process and do not allege a denial of substantive due process.

6) all plaintiffs' state law claim for intentional infliction of emotional distress against Lopez and Solla;

7) all plaintiffs' state law claim for intentional infliction of emotional distress against all individual defendants; and

8) all plaintiffs' § 1983 claim against all defendants based on violations of their Fourth Amendment rights when Christian entered the Olvera/DeRose home.

The County of Sacramento, DHHS, CPS, and the CPS employee defendants now move for summary judgment on all of plaintiffs' claims pursuant to Rule 56 ("County's motion"). County counsel defendants Travis and Guillon also seek summary judgment on the claims against them, primarily on the ground of absolute immunity. Plaintiffs have also requested that the court appoint DeRose as guardian ad litem for the minor plaintiffs before addressing any of the minor plaintiffs' claims.

In their opposition to the County's motion, plaintiffs indicate that they waive their fifth claim under § 1983 based on alleged violations of the First Amendment and all claims against defendants Fermine Perez, Laura Coulthard, Lynn Frank, Joni Edison, Keeva Pierce, Stephanie Lynch, Veronica Carrillo, Fred Demartin, Kim Pearson, Patti Gilbert–Driggs, and Melinda Lake. (Pls.' Opp'n to Cnty.'s Mot. at 2:4–11 (Docket No. 146).) Plaintiffs also indicate that they waive all claims based on defendants' alleged conspiracy to retaliate against Olvera based on his alleged prior "whistleblowing" activity while previously employed with CPS. (*Id.* at 1:15–17.)

## II. *Discussion*

### A. *Motion to Appoint Guardian Ad Litem*

Pursuant to Federal Rule of Civil Procedure 17(c), "[a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem." Fed.R.Civ.P. 17(c). Rule 17(c) provides that the "court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action." *Id.* Recognizing that a motion to appoint a guardian ad litem should have been filed earlier in this action, plaintiffs now request the court to appoint DeRose as a guardian ad litem for the minor children plaintiffs (AND–O, CHD–O, COD–O, SD–O, AGD–O, GD–O, and RD–O) *nunc pro tunc* to the date this action was filed. All defendants have filed statements of non-opposition to this request. (Docket Nos. 157 & 158.) Accordingly, the court will grant plaintiffs' motion to appoint DeRose as guardian ad litem for the minor children plaintiffs *nunc pro tunc* to the date this action was filed.

### B. *Motions for Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which

it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

In resolving a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment ...." *Id.*

In relevant part, § 1983 provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress ....

42 U.S.C. § 1983. While § 1983 is not itself a source of substantive rights, it provides a cause of action against any person who, under color of state law, deprives an individual of federal constitutional rights or limited federal statutory rights. *Id.*;

*Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

In § 1983 actions, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The test for qualified immunity is: (1) identification of the specific right being violated; (2) determination of whether the right was so clearly established as to alert a reasonable officer to its constitutional parameters; and (3) a determination of whether a reasonable officer would have believed that the policy or decision in question was lawful." *McDade v. West,* 223 F.3d 1135, 1142 (9th Cir.2000). The Supreme Court recently held that a court may assume the existence of a constitutional violation under the first inquiry for purposes of the qualified immunity analysis. *Pearson,* 555 U.S. at 236, 129 S.Ct. 808.

The clearly established inquiry "serves the aim of refining the legal standard and is solely a question of law for the judge." *Tortu v. Las Vegas Metro. Police Dep't,* 556 F.3d 1075, 1085 (9th Cir.2009). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards,* —— U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and citation omitted). Whether the unlawfulness of certain conduct is clearly established "depends largely 'upon the level of generality at which the relevant "legal rule" is to be identified.'" *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Anderson v. Creighton,* 483

U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The right must be defined in a "particularized, and hence more relevant, sense," requiring a court to strike a balance between defining a right too generally so that the definition necessarily leads to the conclusion that the right is clearly established and defining the right too narrowly so that prior precedent must mirror the facts of the case in order to conclude that the right has been clearly established. *Saucier v. Katz,* 533 U.S. 194, 202–03, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

 If the court concludes a right is not clearly established, the official is entitled to qualified immunity. *Id.* at 202, 121 S.Ct. 2151. If a right is clearly established, an official is not entitled to qualified immunity unless a · reasonable official would not have known that his conduct violated the clearly established right. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. The reasonableness inquiry recognizes "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude" that their conduct comports with the Constitution and thus shields officials from liability when their mistake is reasonable. *Id.* at 641, 107 S.Ct. 3034.

 While different conclusions can be reached on the clearly established and reasonableness inquiries, the two inquiries are usually intertwined, and the Supreme Court has explained that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that

his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151; *see also Messerschmidt v. Millender,* ——— U.S. ———, ———, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." (internal quotation marks and citation omitted) (alteration in original)); *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

1. *First and Eighth Claims Re: Consent*

In their first claim, the minor children bring a § 1983 claim against Lopez and Solla based on alleged violations of their Fourth Amendment rights when Lopez and Solla interviewed them on December 19, 2008, without the consent of a parent or guardian.[2] In their eighth claim for relief, plaintiffs contend Christian violated plaintiffs' Fourth Amendment rights when she entered the Olvera/DeRose home on January 6, 2009, without consent.

 Defendants seek summary judgment on the first and eighth claims solely on the ground that, because DeRose consented to the interviews of the minor children on December 19, 2008, and consented to Christian's entry on January 6, 2009,

---

**2.** Neither party articulates the theory under which the interviews implicated the minor children's Fourth Amendment rights and therefore the court assumes, for purposes of this motion alone, that the minor children have a cognizable Fourth Amendment claim based on the December 19, 2008, interviews. *Cf. Greene v. Camreta,* 588 F.3d 1011, 1030 (9th Cir.2009) ("[A]pplying the traditional

Fourth Amendment requirements, the decision *to seize and interrogate* [a minor child] in the absence of a warrant, a court order, exigent circumstances, or parental consent was unconstitutional."), *vacated after case determined to be moot by, Camreta v. Greene,* ——— U.S. ———, 131 S.Ct. 2020, 2035, 179 L.Ed.2d 1118 (2011) (emphasis added).

the interviews and entry comported with the Fourth Amendment. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also United States v. Drayton*, 536 U.S. 194, 206–07, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.... Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning.").

### a. *December 19, 2008, Interviews*

To conduct the interviews at issue, Lopez and Solla went to the Olvera/DeRose home the evening of December 19, 2008, with a third social worker, Nikkita Moorer, and two police officers, Taizo Takahashi and Christopher Lemus. In her deposition, DeRose explained that she objected to the interviews of the children:

Ms. Lopez very forcefully said that the kids were going to be interviewed and that she didn't need to explain to me what was going on. And obviously when police show up, I mean I'm familiar enough with the system that I got the point that they were probably going to try to detain my kids. So I was then saying, "No, you're not going to interview my kids." ... I told them no. It was alarming to see that many people on my doorstep. I told them no, I don't want you to interview the kids. And pressure, pressure, pressure by them. And then there was at some point a threat that "We'll take them to the receiving home and interview them." And I said, "Okay. Interview them, but I

want to be present." "No, can't do that." "Okay. Interview them, but I want to record." "No, can't do that." (DeRose Dep. 201:11–202:9.)

Two days after the interviews at issue, DeRose also sent a four-page email to the director of DHHS, Lynn Frank, raising concerns about the interviews:

Within hours, several child abuse investigators and police officers arrived on our door step. Ms. Lopez demanded to interview every child in the house .... While I understood the need for further substantiation of information provided by my son, I was not enthusiastic to have further interviews occur in the absence of an attorney or advocate. I asked Ms. Lopez to wait for the arrival of our attorney. She refused. I asked her if the interviews could be recorded. She refused. I told her why I was uncomfortable and she responded with "you have no choice."

(Powell Decl. Ex. JJ (Docket No. 146–9).)

On the other hand, Lopez testified in her deposition that DeRose stated that she was expecting her when they arrived and said it would be "fine" for Solla and Moorer to begin interviewing the children while Lopez talked with DeRose. (Lopez Decl. ¶¶ 7–10.) Lopez recalled declining DeRose's request to record Lopez and DeRose's conversation, but does not recall DeRose requesting that an attorney be present. (*Id.* ¶¶ 11–12.)

Although Solla did not have a detailed recollection of conversations between Lopez and DeRose about interviewing the children, she testified that she "think[s] [they] asked if we could interview them," recalls it being "pretty easy," and does not recall Lopez threatening to take the children or DeRose requesting that an attorney be present or the interviews be recorded. (Solla Dep. 83:3–6, 91:5–95:22.) Officer Lemus testified only that it is his

practice to request permission to speak to a child alone, (Lemus Dep. 18:6–15), and Moorer and Officer Takahashi could not recall whether DeRose objected to the interviews. (Moorer Dep. 53:1–24; Takahashi Dep. 22:2–15.)

■ The parties' accounts of what occurred leading up to the interviews differ drastically. At summary judgment, the court must construe the facts in the light most favorable to plaintiffs and cannot displace the roll of the jury by determining which version is more credible. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Taking DeRose's account, as depicted through her deposition testimony and email to the DHHS director only two days after the event, the court cannot find, as a matter of law, that DeRose consented to the interviews of the children.[3] Not only did three social workers arrive at DeRose's home on the evening of December 19, 2008, but two police officers also accompanied the social workers. DeRose testified that, given the presence of the police officers, she thought the children would be taken. After DeRose repeatedly objected to the interviews of the children, she was told that the children would be taken to the receiving home and interviewed there. To avoid having the children removed, DeRose "agreed" to the interviews under certain conditions, which Lopez rejected.

■ While DeRose ultimately may have "agreed" to the interviews, a reasonable jury could find that she did so only under the threat that the children would be taken if she did not. The Supreme Court has explained that the Fourth and Fourteenth Amendments "require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coer-cion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth*, 412 U.S. at 228, 93 S.Ct. 2041; *see also United States v. Winsor*, 846 F.2d 1569, 1573 n. 3 (9th Cir.1988) ("As this court has recognized in the situation where police demand entrance to a dwelling, compliance with a [governmental] demand is not consent." (internal quotation marks omitted) (alteration in original)).

Accordingly, because a genuine issue of material fact remains with respect to whether DeRose consented to the interviews of the minor children, the court will deny defendants' motion for summary judgment on the minor children's first claim under § 1983 for alleged violations of their Fourth Amendment rights.

b. *January 6, 2009, Entry by Christian*

■ Similar to the interviews on December 19, 2008, the parties' accounts of what occurred before Christian entered the Olvera/DeRose home on January 6, 2009, differ in significant respects. Christian testified that, when Lopez and she arrived at the Olvera/DeRose home, it was clear that DeRose was upset with Lopez and Christian suggested that Lopez wait in the car while she spoke with DeRose. (Christian Dep. 82:1–13.) She further testified that DeRose "ultimately agreed to let me come in the home and invited me in after I agreed to be tape-recorded during our interview." (*Id.* at 80:25–81:2.) Christian denied that she threatened to have the children removed if DeRose did not speak with her. (*Id.* at 107:2–4.)

On the other hand, DeRose testified at her deposition that she allowed Christian

---

**3.** Because neither party addresses the issue, the court assumes for purposes of this motion that DeRose had legal authority to consent to the interviews of CHD–O, AGD–O, and AND–O.

in her home under threat that the children would be removed if she did not:

Q: Getting back to when Ms. Christian and Ms. Lopez returned to your house on January the 6th, you ultimately relented and you let Wendy Christian come into your home, did you not? ...

A: I did.

Q: And you did that upon the condition that she allow you to tape-record her; correct?

A: No. . . .

Q: She refused to allow you to tape-record her?

A: Yes. . . .

Q: Okay. What was the reason that you finally agreed to let her in the house?

A: Because there again was a reference that we can—"If you don't cooperate, we can take the kids to the receiving home, we can take the kids." There was always these references of . . . .

(DeRose Dep. 235:24–236:23.)

Defendants do not dispute that, if DeRose's testimony is believed, a jury could find that she did not consent to the entry of her home. Instead, defendants argue that DeRose's prior sworn testimony during the juvenile court proceedings "calls into question" her deposition testimony and "removes any question as to whether or not [she] consented" to Christian's entry of the home. (Cnty.'s Reply at 33:10–34:15.) Specifically, during the juvenile court proceedings on February 18, 2009, DeRose provided the following testimony while under oath:

Q: The second time that Child Protective Services came to the house approximately when was that in relation to the first visit?

A: A month, a month-ish, maybe three weeks later . . . .

Q: Okay. What happened after the social worker explained the purpose of the visit to you?

A: I told her that I didn't feel comfortable with [Lopez] coming in my home, that Miss Christian was welcomed to come in.

(O'Dea Decl. Ex. I at 224:22–225:23.) In arguing that this evidence is sufficient for the court to grant summary judgment, defendants misconstrue the court's role at summary judgment. Although the prior testimony may significantly undermine the credibility of DeRose's deposition testimony, the court cannot displace the role of the jury and assess DeRose's credibility. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment . . . ."). DeRose's deposition testimony is sufficient to create a triable issue of fact that she did not voluntarily consent to Christian entering her home.

Accordingly, the court must deny defendants' motion for summary judgment on the eighth claim for a violation of the Fourth Amendment as to Christian. Because the parties treat the claim as against only Christian and only Christian entered the home, the court will grant defendants' motion for summary judgment as to all remaining defendants on that claim.

2. *Third and Fourth Claims for Violations of the Fourteenth Amendment Rights to Familial Association*

 a. *Olvera and DeRose's Rights to Familial Association*

In their third and fourth claims, Olvera and DeRose assert that particular defendants violated their Fourteenth Amendment rights to familial association based on CHD–O's removal on February 5, 2009,

and continued detention for fourteen days following the removal. Olvera and De-Rose claim that their rights to familial association derive from their status as "de facto parents" or "prospective adoptive parents" of CHD–O under California law.

■ "[F]reedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–640, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). "There does exist a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection." *Smith v. Org. of Foster Families for Equality & Reform,* 431 U.S. 816, 842, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (internal citation omitted). Traditionally, these rights have extended to only biological parents. *See id.* at 843–44, 97 S.Ct. 2094 ("[T]he usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element.... [But n]o one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship.").

■ "[T]here is no question that *parents* have a constitutionally protected liberty interest in making decisions about the care, custody, and control of their children." *Miller v. California,* 355 F.3d 1172, 1175 (9th Cir.2004). "The constitutional right of parents and children to live together without governmental interference is well established [and t]he Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.,* 237 F.3d 1101, 1107 (9th Cir.2001).

"Where procedural due process must be afforded because a 'liberty' or 'property' interest is within the Fourteenth Amendment's protection, there must be determined 'what process is due' in the particular context." *Smith,* 431 U.S. at 847, 97 S.Ct. 2094.

■ With parents, "the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.' " *Id.* at 845, 97 S.Ct. 2094. Unlike those intrinsic rights and similar to foster parents, any rights Olvera and DeRose assert as de facto parents or prospective adoptive parents derive entirely from state law. "While the Court has recognized that liberty interests may in some cases arise from positive-law sources, in such a case ... it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Id.* at 845–46, 97 S.Ct. 2094 (internal citation omitted). While the court must look to state law to determine "the expectations and entitlements of the parties," *id.* at 846, 97 S.Ct. 2094, the question of whether any liberty interest created by state law is protected under the federal Due Process Clause is a question of federal law. *See Town of Castle Rock v. Gonzales,* 545 U.S. 748, 757, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) ("Although the underlying substantive interest is created by an independent source such as state law, *federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." (internal quotation marks and citations omitted)).

### 1. *De Facto Parents*

■ California Rules of Court provide that a "de facto parent" is " 'a person

who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period.'" *In re Patricia L.,* 9 Cal.App.4th 61, 66, 11 Cal.Rptr.2d 631 (4th Dist.1992) (quoting Cal. Rules of Court 1401(a)(4)). "The concept of .a de facto parent was judicially created to recognize limited rights in dependency cases for a person who has been found by the juvenile court to have assumed on a day-to-day basis the role of a parent, fulfilling the child's physical and psychological needs for a substantial period of time." *R.H. v. Superior Court,* 209 Cal.App.4th 364, 371, 147 Cal.Rptr.3d 8 (4th Dist.2012). The purpose of de facto parent status is to enable "very important persons in the minor's life" to assert their interests in the "companionship, care, custody and management of the child" during a dependency proceeding and provide the court with "critical information relating to the child's best interests." *In re Patricia L.,* 9 Cal. App.4th at 66, 11 Cal.Rptr.2d 631 (internal quotation marks and citation omitted). "A person seeking de facto parent status must file a written application and establish by a preponderance of the evidence that he or she falls within the definition of a de facto parent." *Id.* at 67, 11 Cal.Rptr.2d 631.

■ Here, Olvera and DeRose concede that they were not designated de facto parents by a juvenile court, but nonetheless argue that, "in every relevant sense," that is what they were. (Pls.' Opp'n to Cnty.'s Mot. at 90 n. 49.) Plaintiffs have not cited any authority, however, for treating them as de facto parents under California law in the absence of having sought and received that status by a juvenile court. Even assuming a juvenile court could have granted Olvera and DeRose de facto parents status, a de facto parent's rights under California law "are not equated" with the rights of parents and are limited to being present, having retained or appointed counsel, and presenting evidence in a dependancy proceeding. *R.H.,* 209 Cal.App.4th at 371–72, 147 Cal.Rptr.3d 8 (internal quotation marks and citation omitted); *see also In re Kieshia E.,* 6 Cal.4th 68, 76, 23 Cal.Rptr.2d 775, 859 P.2d 1290 (1993) (*"Within its limited scope,* the doctrine of de facto parenthood has since been liberally applied to ensure that all legitimate views, evidence, and interests are considered in dispositional proceedings involving a dependent minor." (emphasis added)); *In re Joshuia S.,* 205 Cal.App.3d 119, 122, 252 Cal.Rptr. 106 (4th Dist.1988) ("[T]he mother is placing too much significance in the status of de facto parent. The granting of such status does not automatically confer custody of the minor dependent child on persons recognized as de facto parents . . . .").

In *Miller,* grandparents, who had been granted de facto parent status by the juvenile court, argued that they had a substantive due process right to family integrity under the Fourteenth Amendment because "they had assumed the role of parents to their grandchildren by providing for their care, comfort, and protection as well as their physical and psychological needs for a substantial period of time." *Miller,* 355 F.3d at 1175. The Ninth Circuit rejected the grandparents' claim that their status as de facto parents "under California law for purposes of the juvenile court proceedings create[d] a liberty interest in contact with the children." *Id.* at 1176. After recognizing the limited rights de facto parent status provides during dependency proceedings, the court concluded, "being de facto parents simply gave the [grandparents] the right to appear in the proceeding . . . . It conferred no other, or weightier interest of constitutional dimension." *Id.*

Accordingly, because de facto parent status is insufficient to give rise to a liberty interest cognizable under the Fourteenth Amendment, Olvera and DeRose's reliance on their status as being akin to de facto parents is unavailing. Moreover, even if a relationship akin to de facto parents could give rise to a liberty interest under the facts of this case, plaintiffs have not shown that any such right was clearly established at the time CHD–O was removed and detained, thus defendants would be entitled to qualified immunity under such a theory.

## 2. *Prospective Adoptive Parents*

Olvera and DeRose next contend that they had a liberty interest in their continued companionship with CHD–O as prospective adoptive parents under California law. On December 22, 2008, Olvera filed an Adoption Request form and Parental Consent to Adoption form with the Del Norte County Superior Court. (O'Dea Decl. Ex. B; Olvera Dep. 321:5–23.) The Adoption Request Form checked box 16, which states, "I will ask the court to end the parents rights of [blank]," but does not identify Morrison, Miess, or any individuals in the blank area provided. (O'Dea Decl. Ex. B.) The Parental Consent to Adoption form was also completed erroneously in that it states, "I/we, being the parents of [CHD–O] ... give my/our full and free consent to the adoption of said child by Susan E. Morrison and Kelly B. Miess." (*Id.* Ex. A.)

It is undisputed that the Adoption Request form was also incomplete because it did not attach a copy of an Independent Adoption Placement Agreement as provided for in the Adoption Request form. (*See id.* Ex. A at 2 (indicating that a copy of the Independent Adoption Placement Agreement is attached to the form and was signed by all persons with parental rights); Olvera Dep. 322:3–324:9.) Olvera testified that Morrison and Miess had not signed an Adoption Placement Agreement before February 5, 2009. (Olvera Dep. 250:5–8.)

Under California law, a child must be "placed for adoption" prior to the filing of an adoption request. *See* Cal. Fam. Code § 8802. Completion of an Independent Adoption Placement Agreement was necessary in order for CHD–O to have been "placed" with Olvera and DeRose for adoption under California law. Specifically, Family Code section 8539 provides,

> "Place for adoption" means, in the case of an independent adoption, the selection of a prospective adoptive parent or parents for a child by the birth parent or parents *and the completion of an adoptive placement agreement on a form prescribed by the department by the birth parent or parents placing the child with prospective adoptive parents.*

Cal. Fam. Code § 8539 (emphasis added); *see also* Cal. Fam. Code § 8801.3 (detailing additional requirements before a child can be "considered to have been placed for adoption").

Olvera and DeRose's incomplete Adoption Request filed in Del Norte County for the adoption of CHD–O was never finalized. (Olvera Dep. 246:7–247:1.) Instead, a new Adoption Request was filed in Sacramento County Superior Court on August 20, 2009. (O'Dea Decl. Ex. C.) In connection with that adoption, Morrison and Miess executed an Independent Adoption Placement Agreement on September 18, 2009. (DeRose Dep. 297:9–12.) On May 24, 2010, the Sacramento County Superior Court issued an Adoption Order granting the independent adoption of CHD–O by Olvera and DeRose. (O'Dea Decl. Ex. D.)

Relying on *Jinny N. v. Superior Court,* 195 Cal.App.3d 967, 241 Cal.Rptr. 95 (4th Dist.1987), plaintiffs argue that the absence of the Independent Adoption Placement Agreement does not preclude a find-

ing that CHD–O was "placed" with Olvera and DeRose for adoption. In *Jinny N.,* the Orange County Social Services Agency had placed a child with Jinny N. as a foster child, but then "directly asked Jinny N. to apply to adopt the child" and "repeatedly wrote Jinny N. directly or through counsel, urging and offering to help complete adoption." *Jinny N.,* 195 Cal.App.3d at 972, 241 Cal.Rptr. 95. Because the agency had "verifiably solicit[ed], nurture[d], and confirm[ed] an adoptive placement," the appellate court rejected the trial court's finding that the "signing [of] a formal adoptive placement agreement is prerequisite to becoming a prospective adoptive parent." *Id.* at 970–71, 973, 241 Cal.Rptr. 95.

■ The reasoning of *Jinny N.,* however, has little application to the case at hand. First, the case arose within the context of an agency adoption in which the agency had already placed the child with Jinny N. as a foster parent. The court recognized the difficulty in drawing the line between the moment a foster placement can "metamorphose" into an adoptive placement. *Id.* at 972–73, 241 Cal.Rptr. 95. Second, in determining when this "metamorphose" might have occurred, the court explained, "[t]he intent of the parties must surely be evaluated, along with the objective indicia of adoption proceedings." *Id.* at 972, 241 Cal.Rptr. 95. Even assuming that Morrison and Miess intended to place CHD–O with Olvera and DeRose, any "objective indicia of adoption proceedings" were unequivocal at best. Not only was an Independent Adoption Placement Agreement lacking, but the Parental Consent to Adoption form, which was the only form containing Morrison and Miess's signatures, did not identify Olvera and DeRose as the prospective adoptive parents of CHD–O. Compared to the frequent communications by the agency seeking to facilitate Jinny N.'s agency adoption of the child, there is a paucity of objective indicia

of any independent adoption proceedings in the case at hand. Plaintiffs have therefore not established a disputed issue of fact with respect to whether CHD–O was placed with Olvera and DeRose for adoption.

Nonetheless, plaintiffs contend that, even without considering the deficient Adoption Request and Parental Consent to Adoption forms filed in Del Norte County, Olvera and DeRose had prospective adoptive parent status at the time CHD–O was removed under California Family Code section 8542. Section 8542 provides, "'Prospective adoptive parent' means a person who has filed *or intends to file* a petition under Part 2 (commencing with Section 8600) to adopt a child who has been or who *is to be placed* in the person's physical care ...." Cal. Fam. Code § 8542 (emphasis added).

■ Even assuming, however, that Olvera and DeRose were prospective adoptive parents under section 8542, it does not follow that, as prospective adoptive parents under that statute, they had a liberty interest protected by the Due Process Clause. "The extent to which other creations of state law resembling parental rights, such as foster parents and de facto parents, give rise to accompanying constitutional liberty interests depends on the contexts in which the issues are raised." *Brittain v. Hansen,* 451 F.3d 982, 995 (9th Cir.2006).

In *Adoption of Baby Girl B.,* 74 Cal. App.4th 43, 87 Cal.Rptr.2d 569 (4th Dist. 1999), a California appellate court held that "it is well established that a prospective adoptive parent with whom a child has been placed for adoption has a liberty interest in continued custody." *Baby Girl B.,* 74 Cal.App.4th at 51, 87 Cal.Rptr.2d 569. Based on this liberty interest, the court stated that "a prospective adoptive parent has a constitutional right to notice and 'a

full hearing' before the adoptive placement can be terminated, at least in the absence of urgent or emergency circumstances." *Id.* In that case, however, it was undisputed that the biological mother had executed an adoption placement agreement and that her consent to the adoption had become irrevocable, that the prospective adoptive parent had filed an adoption petition, that the child had been placed with the prospective adoptive parent under the relevant state statutes, and that the Department of Social Services had reviewed the petition. From the court's detailed outline of the relevant steps in the process, it is clear that each of these occurrences necessarily led to the prospective adoptive parents *statutory* right to a hearing before the placement could be terminated.[4]

*Baby Girl B.* cannot be blindly applied to this case because the context in which the prospective adoptive parent's right to procedural due process arose varies greatly from the context in which Olvera and DeRose assert rights as prospective adoptive parents. First, not only is it undisputed that CHD–O was never placed with Olvera and DeRose before the challenged removal, nothing in the record suggests that any action was taken by the state based on the deficient Adoption Request. Second, plaintiffs do not contend that, at the time of the removal, Olvera and De-

---

4. The court outlined the relevant statutes and procedures that led to a statutory right to a hearing in *Baby Girl B.*:

Once the adoption placement agreement has been signed, the prospective adoptive parent may petition for adoption. (Fam. Code, § 8802, subd. (a)(1)(C).) The court clerk must give notice of the petition to the Department. (Fam. Code, § 8802, subd. (a)(2).) In addition, when the petition is filed, the petitioner must file a copy of the petition with the Department. (Fam. Code, § 8808.) The Department must "investigate the proposed independent adoption" (Fam. Code, § 8807, subd. (a)) and "ascertain whether the child is a proper subject for adoption and whether the proposed home is suitable for the child." (Fam. Code, § 8806; *see also* Cal. Code Regs., tit. 22, §§ 35079, subd. (b), 35081, 35083, 35087, 35089, 35093.) It must interview the petitioners and the birth parents. (Fam. Code, § 8808; *see also* Cal.Code Regs., tit. 22, § 35083.) Within 180 days after the petition is filed, the Department must "submit to the court a full report of the facts disclosed by its inquiry with a recommendation regarding the granting of the petition." (Fam. Code, § 8807, subd. (a); *see also* Cal. Code Regs., tit. 22, §§ 35091, 35123, subd. (a).) A copy of the report must be given to the petitioner. (Fam. Code, § 8821.) Under the Department's own regulations, this must be done at the same time as the report is filed. (Cal. Code Regs., tit. 22, § 35123, subd. (g).)

If the Department finds the petitioner's home is not suitable for the child, and if it recommends that the petition be denied, the clerk must refer the report to the court "for review." (Fam. Code, § 8822, subd. (a).) The court must set a hearing on the petition and must "give reasonable notice of the hearing" to the petitioner, the birth parents, and the Department. (Fam. Code, § 8822, subd. (b).)

At the hearing, the Department is deemed to represent the child. (Fam. Code, § 8822, subd. (c).) Subject to exceptions not relevant here, the prospective adoptive parents must appear in person at the hearing. (Fam. Code, §§ 8612, 8613, 8823.) The court must "examine all persons appearing before it . . . ." (Fam. Code, § 8612, subd. (a).) If the court is satisfied that adoption will promote the interest of the child, it may enter an order of adoption. (Fam. Code, § 8612, subd. (c).) If, however, it "sustains the recommendation of the department . . . that the child be removed from the home of the petitioners because the department . . . recommends denial . . . or if the court dismisses the petition and does not return the child to the birth parents, the court shall commit the child to the care of the department . . . for the department . . . to arrange adoptive placement or to make a suitable plan." (Fam. Code, § 8805.)

*Adoption of Baby Girl B.*, 74 Cal.App.4th at 49–50, 87 Cal.Rptr.2d 569 (omissions and citations in original).

Rose were entitled to any of the statutory protections at issue in *Baby Girl B.* It strains reason to conclude that, in the absence of a grant of statutory rights similar to those in *Baby Girl B.*, that the mere language of section 8542 and Olvera, De-Rose, Morrison, and Miess's future intent to take action unknown to the state could give rise to a legitimate expectation of a state entitlement sufficient to arise to a constitutional liberty interest.

In the context of a different statutory scheme, the California Fourth Appellate District recently recognized the limited statutory nature of any rights held by prospective adoptive parents. *R.H.*, 209 Cal.App.4th at 364, 147 Cal.Rptr.3d 8. In *R.H.*, the court explained that prospective adoptive parents' rights under Welfare and Institutions Code section 366.26(n) are "akin to those of de facto parents, but are even more circumscribed." *Id.* at 372, 147 Cal.Rptr.3d 8. After reviewing the limited statutory rights of a prospective adoptive parent, the court concluded that, while they "have rights under section 366.26, subdivision (n) to notice and the opportunity to object and to participate in the hearing, [ ] they have *no fundamental liberty interest in the child* and no statutory or due process right to appointed counsel at the hearing." *Id.* at 374–75, 147 Cal. Rptr.3d 8 (emphasis added).[5]

Moreover, when California appellate courts have concluded that prospective adoptive parents were entitled to procedural due process protections before removal of the prospective adoptive child from their home, the adoptions at issue were agency, not independent, adoptions.

*E.g., Jinny N.*, 195 Cal.App.3d at 971, 241 Cal.Rptr. 95. In an agency adoption, parental rights have been terminated or the child has been relinquished to the agency and the agency has custody of the child. *See generally* Cal. Fam. Code § 8704. Here, it is undisputed that the albeit insufficient and ultimately abandoned adoption in Del Norte County and the subsequent and successful adoption in Sacramento County were independent adoptions. Unlike an agency adoption, an "independent adoption" as is an adoption "in which neither the department, county adoption agency, nor agency licensed by the department is a party to, or joins in, the adoption petition." *Id.* § 8524.

For example, in *C.V.C. v. Superior Court*, 29 Cal.App.3d 909, 106 Cal.Rptr. 123 (3d Dist.1973), addressed an agency adoption under former Civil Code section 224n (now Family Code section 8704) where the Sacramento County Department of Social Welfare had "placed" a child with plaintiffs as "prospective adoptive parents." *C.V.C.*, 29 Cal.App.3d at 912, 106 Cal.Rptr. 123. Although the statute provided procedural safeguards for prospective adoptive parents only after the parents had filed an adoption petition, the court concluded that the prospective adoptive parents were entitled to notice and a hearing before removal of the child from their home even before the parents had filed the adoption petition. *See Dep't of Soc. Servs. v. Superior Court*, 58 Cal. App.4th 721, 736, 68 Cal.Rptr.2d 239 (3d Dist.1997) (discussing *C.V.C.*). Unlike the case at hand, however, it was undisputed

---

**5.** Plaintiffs distinguish *R.H.* only on the ground that it involved prospective adoptive parents under Welfare and Institutions Code section 366.26(n), not Family Code section 8542. Plaintiffs overlook the fact, however, that prospective adoptive parents were in fact granted some statutory protections in section 366.26. Plaintiffs have not identified a single statutory right that arose in the context of their case based on their alleged prospective adoptive parent status under section 8542. Surely a statute that confers some rights would be more likely to give rise to a legitimate expectation of entitlement than one that confers no rights at all.

in *C.V.C.* that the plaintiffs were prospective adoptive parents under the relevant statute and that the agency had placed the child with them.

Similarly, in *Spielman v. Hildebrand,* 873 F.2d 1377 (10th Cir.1989), the Tenth Circuit held that preadoptive parents "may have [had] . . . a reasonable expectation of developing a permanent relationship with the child that rises to a liberty interest meriting limited due process protection." *Spielman,* 873 F.2d at 1385. In that case, however, the rights of the natural parents had been terminated, the state had placed the children with the preadoptive parents and executed a written preadoption agreement that restricted the state Department of Social and Rehabilitation Services's ("SRS") right to remove the children, and the SRS had encouraged the plaintiffs to treat the children as their own. *Id.* at 1384–85. The Tenth Circuit thus expressly relied on the "preadoption agreement, coupled with the SRS representations at the time the children were placed" with the preadoptive parents to conclude that the preadoptive parents may have a liberty interest sufficient to merit the protections of the Procedural Due Process Clause. *Id.* at 1385.

Plaintiffs have not identified any action by the state or conferral of statutory rights similar to that in *C.V.C.* or *Spielman* that could give rise a legitimate expectation cognizable under the Due Process Clause. At a minimum, Olvera and DeRose's status as prospective adoptive parents and any such resulting liberty interest under the Due Process Clause was far from clearly established and defendants would thus be entitled to qualified immunity in the event that Olvera and DeRose were prospective adoptive parents and had a resulting liberty interest.

Accordingly, because Olvera and DeRose have not established that they had rights to familial association under the Fourteenth Amendment in relation to CHD–O, let alone that those rights were clearly established, the court must grant defendants' motion for summary judgement on Olvera and DeRose's third and fourth claims for relief.

b. *Morrison and Miess's Rights to Familial Association*

■ It is undisputed that, at the time CHD–O was taken into protective custody, Morrison and Miess were his adoptive parents. It is also undisputed that Morisson and Miess had signed a guardianship agreement with Olvera and DeRose on October 22, 2007, that gave Olvera and DeRose temporary guardianship over CHD–O. (Miess Dep. 75:11–14, 76:7–77:3.) At the time CHD–O was removed and taken into protective custody, he had been living exclusively in the Olvera/DeRose home for approximately two years. Based on these circumstances, defendants claim that they are entitled to qualified immunity on Morrison and Miess's third and fourth claims because it was not clearly established at the time CHD–O was removed that his removal would violate Morrison and Miess's rights to familial association.

Nine months after CHD–O was removed from the Olvera/DeRose home, the Ninth Circuit decided *Burke v. County of Alameda,* 586 F.3d 725 (9th Cir.2009). In that case, a police officer had taken a child into protective custody without a warrant based on his determination that the child was in imminent danger. At the time the child was taken into custody, the child's mother and father had joint legal custody of the child, but the child lived with her mother and step-father and the mother had sole physical custody. The mother and father brought § 1983 claims under the Procedural Due Process Clause based on the removal of their child without prior judicial authorization or reasonable cause

to believe the child was in imminent danger. The parent's claim was based on the Ninth Circuit's prior holding in *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir.2000), that "[o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Burke*, 586 F.3d at 731 (quoting *Wallis*, 202 F.3d at 1138) (alteration in original).[6]

With respect to the father's claim, the Ninth Circuit recognized that "non-custodial parents have a reduced liberty interest in the companionship, care, custody, and management of their children," *id.* at 733, and that the "interest is unambiguously lesser in magnitude than that of a parent with full legal custody," *id.* (internal quotation marks and citation omitted). Noting that the court was presented with "a question of first impression," it held that, even if the father's interest in his daughter's "companionship was somehow reduced, he was not without any interest in the custody and management of [his daughter]" and extended the limitation on removal of a child without a warrant or imminent danger "to parents with legal custody, regardless of whether they also possess physical custody of their children." *Id.*

The court ultimately concluded that the officer was entitled to qualified immunity because its holding that the limitation on removal extended to parents with legal custody even in the absence of physical custody was not clearly established before its decision in *Burke*. *Id.* at 734; *accord*

*Schwenk v. County of Alameda*, 364 Fed. Appx. 336, 337 (9th Cir.2010). The court explained that "*Wallis* referred only to the removal of a child from 'the custody of its parent,'" that the court had "never defined the type of custody," and that "custody is commonly thought of referring only to 'physical' custody." *Id.*

Here, the PCW states, and plaintiffs do not dispute, that Lopez contacted Morrison and Miess about CHD–O prior to obtaining the PCW. The PCW indicates that Morrison and Miess had "temporarily placed the child ... in the home of" Olvera and DeRose on April 8, 2007, "due to their inability to care for the child." (Powell Decl. Ex. S ("PCW") at 4.) After Miess initially refused to talk to Lopez before talking to Olvera and DeRose, Morrison contacted Lopez and indicated that both Morrison and Miess consented to Olvera and DeRose's adoption of CHD–O, that she was "'not interested in talking'" to Lopez any further about the case, and that "any questions could be referred to the attorney for" Olvera and DeRose. (*Id.* at 4–5.)

Based on this information, a social worker would be reasonable in believing that Olvera and DeRose had physical custody of CHD–O and that Morrison and Miess did not intend to regain physical custody of him. Moreover, even under *Burke*'s extension of *Wallis* to "parents with legal custody, regardless of whether they also possess physical custody," Lopez's contact of Morrison and Miess was likely sufficient to comport with their rights of familial association.

In *Burke*, the Ninth Circuit did not indicate that the father's rights to familial association necessitated that the officer

---

**6.** Plaintiffs argue that *Burke* is not relevant to this case because it dealt with removal without a warrant and, here, CHD–O was removed pursuant to a protective custody war-rant. However, plaintiffs contend that the PCW was obtained through judicial misrepresentation and thus could not justify CHD–O's removal.

transfer physical custody of the child to the father. Instead, the court indicated only that, against the current legal backdrop, "we cannot say that *failing to contact* [the father], who did not have physical custody of [the child], was clearly unlawful." *Burke,* 586 F.3d at 734 (emphasis added). The court further noted:

> [T]he test in *Wallis* is flexible and must take into account the individual circumstances. For example, if the parent without physical custody does not reside nearby, and a child is in imminent danger of harm, it is probably reasonable for a police officer to place a child in protective custody without attempting to place the child with the geographically distant parent.

*Id.* at 733. Since *Burke,* the Ninth Circuit has also treated the requirement as one to "contact" a non-custodial guardian:

> [Defendants] were entitled to qualified immunity even though they failed to contact [the non-custodial guardian] before they placed [the children] in protective custody. It was not clearly established as of April 26, 2006, that *officials must contact* a child's second legal guardian before they place the child in protective custody when that guardian lives with another guardian, who the officials reasonably suspect is abusing the child.

*Barnes v. County of Placer,* 386 Fed.Appx. 633, 636 (9th Cir.2010) (emphasis added).

As previously discussed, it is undisputed that Lopez contacted Morrison and Miess prior to submitting the PCW and that they indicated that they consented to Olvera and DeRose's adoption of CHD–O and did not wish to speak with Lopez further. It is also undisputed that, at the time of CHD–O's removal, Morrison and Miess lived in Wisconsin. Given this information, it is likely that Lopez's communications with Morrison and Miess would have been sufficient under *Wallis* and *Burke.* At the very least, it was not "beyond debate," *Reichle,* 132 S.Ct. at 2093, at the time of CHD–O's removal that taking him into protective custody violated Morisson and Miess's rights to familial association and defendants are therefore entitled to qualified immunity on Morrison and Miess's third and fourth claims. Accordingly, the court must grant defendants' motion for summary judgment on Morrison and Miess's third and fourth claims under § 1983 for violations of their Fourteenth Amendment rights to familial association.

#### c. *Minor Children Plaintiffs' Rights to Familial Association*

■ RD–O, SD–O, GD–O, AGD–O, AND–O, and COD–O, who were living in the Olvera/DeRose home at the time of CHD–O's removal, also seek recovery under the third and fourth claims based on the removal and continued detention of CHD–O. Relying only vaguely on the "emotional attachments" between siblings, plaintiffs do not cite a single case in support of their theory that siblings have a liberty interest protected by the Due Process Clause. In fact, the Ninth Circuit has expressly rejected such a claim, explaining that, Supreme Court precedent does not "support[ ] an interest for siblings consonant with that recognized for parents and children." *Ward v. City of San Jose,* 967 F.2d 280, 284 (9th Cir.1991); *accord Rentz v. Spokane County,* 438 F.Supp.2d 1252, 1265 (E.D.Wash.2006) ("The Ninth Circuit has held that a sibling does not possess a constitutionally protected liberty interest in the companionship of another sibling.").

■ Moreover, as CHD–O was not even adopted by Olvera and DeRose at the time of his removal from the home, plaintiffs fail to address how the other children in the home had a cognizable liberty interest in his continued residence at the home. Unlike with Olvera and DeRose, where plaintiffs at least rely on purported rights

under state law as de facto parents or prospective adoptive parents, plaintiffs have not advanced any such theory with respect to the minor children plaintiffs. Accordingly, plaintiffs have failed to advance a plausible theory, let alone establish the genuine issue of material fact for trial, that the minor children plaintiffs have a cognizable liberty interest under the Due Process Clause that was violated when CHD–O was removed from the Olvera/DeRose home. Accordingly, the court must grant defendants' motion for summary judgment on the minor children plaintiffs' third and fourth claims under § 1983 for violations of their Fourteenth Amendment rights.

### 3. *CHD–O's Second Claim for Violation of the Fourth Amendment*

#### a. *Requisite Personal Participation*

 Although the second claim is asserted against all defendants, plaintiffs claim there is a disputed issue of material fact as to the participation of only Lopez, Schrage, Cullivan, Jones, Travis, and Guillon. It is undisputed that Lopez drafted the PCW and Travis and Guillon do not dispute that they sufficiently participated in drafting or editing the PCW. Thus, the only issue is whether a genuine issue of material fact remains with respect to whether Schrage, Cullivan, and Jones sufficiently participated in drafting or editing the PCW so as to render them proper defendants to CHD–O's claim for a violation of his Fourth Amendment right.

 "Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). " '[I]ntegral participation' [is required] by each officer as a predicate to liability," but " 'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation."

*Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir.2004).

During her deposition, Lopez testified that, as Lopez's supervisor, Schrage was involved in editing the PCW:

Q: Okay. Are you aware of Eva Schrage making any edits to your warrant application?

A: Yes.

Q: Okay. Which ones do you remember?

A: It was edited at length, and some of the statements were made more concise. What I recall doing with my initial warrant was I basically gave a full narrative of the case from beginning to end. And it was very substantial in length. And it was edited because at the time the court had requested that the Department keep all protective custody warrants under a specific length. Because of the amount of warrants they were reviewing, they wouldn't have say enough time to read a, you know, 15–20-page warrant application. . . . With this case it was difficult for me to that, and so a large part of the editing on what to include and what not to include was— was based on the advisements of my superiors.

(Lopez Dep. 378:17–379:12; *see also* Lopez Dep. 422:16–423:3 (indicating that she believes she expressed concern to Schrage about information that had been edited out of the PCW).) Although Schrage denied that she read the PCW, (*see* Schrage Dep. 123:8–11), she attended the staffing meeting on January 22, 2009, (*id.* at 107:9–108:3). Her participation in the staffing and Lopez's testimony is sufficient to create a triable issue of fact with respect to whether she was an integral participant in drafting the PCW so as to hold her liable under § 1983. At trial, plaintiffs must ul-

timately prove that Schrage was an integral participant in drafting or editing the PCW as it relates to the misrepresentations that could give rise to a cognizable Fourth Amendment violation.

With respect to Cullivan and Jones, who were part of the Court Services unit of CPS, the only testimony plaintiffs cite regarding their involvement in preparing the PCW was equivocal testimony from Lopez that one of them explained that information deleted from the PCW could be expanded upon in further reports to the court:

> A: I believe I had concerns regarding the editing out of—there were certain statements that were made that were found to be I guess not relevant that I felt were relevant because I was told the information would be expanded upon in further court reports. . . .
>
> Q: And the person who said expanded, you gave me that name? Would be expanded upon later as—that wasn't the attorneys; right? That was—
>
> A: I believe I stated it was either County counsel or Court Services that had told me to—to kind of. . . .
>
> Q: But the Court Services, does that got—did that have a name associated with it?
>
> A: I'm not sure if it was Jennifer Cullivan.
>
> Q: Or Jones; right?
>
> A: Or Jones. I'm not—I remember having more contact with Ms. Cullivan than with Bryan Jones.

(Lopez Dep. 423:8–424:3.) Not only is this testimony equivocal as to whether it was Cullivan or Jones that might have told Lopez that the information could be expanded on in subsequent submissions to the court, it does not, without more, create a genuine issue of material fact that Cullivan or Jones was an integral participant in drafting the content of the PCW or even had knowledge as to the content of the PCW, let alone any material misrepresentations.[7]

Accordingly, because plaintiffs have established a triable issue of fact that only Lopez, Schrage, Travis, and Guillon sufficiently participated in the drafting and editing of the PCW to give rise to liability under § 1983, the court will grant defendants' motion for summary judgment on CHD–O's second claim as to all defendants except Lopez, Schrage, Travis, and Guillon.

b. *Qualified Immunity/Judicial Deception*

 In relevant part, California Welfare and Institutions Code section 340 provides, "Whenever a petition has been filed in the juvenile court alleging that a minor comes within Section 300 and praying for a hearing thereon, . . . and it appears to the court that the circumstances of his or her home environment may endanger the health, person, or welfare of the minor . . . a protective custody warrant may be issued immediately for the minor." The issuance of the warrant to place CHD–O in protective custody must therefore have been supported by probable cause that the circumstances in the Olvera/DeRose home endangered CHD–O's health or welfare. "[P]robable cause exists where under the totality of the circumstances known to the officer, a prudent person would have concluded that there was a fair probability

---

**7.** Plaintiffs submitted a copy of a subsequent detention report, which Cullivan and Jones signed. (Powell Decl. Ex. W.) At oral argument, however, plaintiffs clarified that their claim based on any statements in the deten-
tion report that allegedly caused CHD–O's continued detention is limited to the fourth claim, which raises the rights of familial association and is asserted by all plaintiffs except CHD–O.

that the suspect had committed or was committing a crime." *United States v. Noster,* 590 F.3d 624, 629–30 (9th Cir. 2009). Plaintiffs contend that the seizure of CHD–O on February 9, 2009, was unconstitutional because the warrant for protective custody of CHD–O was obtained through fraud and deceit by omitting material information from the PCW.

Lopez and Schrage contend they are entitled to qualified immunity on CHD–O's claim based on alleged judicial deception in obtaining the warrant for protective custody of CHD–O. When addressing § 1983 claims based on judicial deception, the standard for qualified immunity is governed by *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Liston v. County of Riverside,* 120 F.3d 965, 972 (9th Cir.1997); *see also Liston,* 120 F.3d at 972 ("The *Franks* standard, although developed in a criminal context, also defines the scope of qualified immunity in civil rights actions. *Franks* established a criminal defendant's right to an evidentiary hearing when he made a showing of deliberate or reckless disregard for the truth in a search warrant affidavit and demonstrated that but for the dishonesty, the affidavit would not support a finding of probable cause." (internal quotation marks and citations omitted)).

 "To survive summary judgment on a claim of judicial deception, a § 1983 plaintiff need not establish specific intent to deceive the issuing court." *Bravo v. City of Santa Maria,* 665 F.3d 1076, 1083 (9th Cir.2011). Rather, the plaintiff "must 1) make a 'substantial showing' of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred." *Liston,* 120 F.3d at 973. Under the second prong examining whether "the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause,"

*Bravo,* 665 F.3d at 1083, the court determines the materiality of the alleged false statements or omissions. *Butler v. Elle,* 281 F.3d 1014, 1024 (9th Cir.2002). "[W]here probable cause is otherwise lacking, an officer who obtains a warrant by recklessly or intentionally including false statements (or omitting material facts) 'cannot be said to have acted in a reasonable manner and the shield of qualified immunity is lost.'" *Liston,* 120 F.3d at 972 (quoting *Branch v. Tunnell,* 937 F.2d 1382, 1387 (9th Cir.1991), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1125 (9th Cir. 2002)).

 "The omission of facts rises to the level of misrepresentation only if the omitted facts cast doubt on the existence of probable cause." *Ewing v. City of Stockton,* 588 F.3d 1218, 1226 (9th Cir.2009) (internal quotation marks and citation omitted). "[A] Fourth Amendment violation occurs where 'the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading.'" *Liston,* 120 F.3d at 973 (internal quotation marks and citation omitted). "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *Ewing,* 588 F.3d at 1224 (internal quotation marks and citations omitted). Under this prong, "[s]ummary judgment is improper where 'there is a genuine dispute as to the facts and circumstances within an officer's knowledge or what the officer and claimant did or failed to do.'" *Bravo,* 665 F.3d at 1087 (quoting *Hopkins v. Bonvicino,* 573 F.3d 752, 763 (9th Cir.2009)); *see also Bravo,* 665 F.3d at 1087 (indicating that "clear proof" is not required).

 Under the second prong, which assesses whether information omitted from

an application for a warrant is material, the court must "consider 'whether the affidavit, once corrected and supplemented, establishes probable cause.' " *Id.* at 1084 (quoting *Ewing,* 588 F.3d at 1224). "The materiality element—a question for the court—requires the plaintiff to demonstrate that 'the magistrate would not have issued the warrant with false information redacted, or omitted information restored.' " *Smith v. Almada,* 640 F.3d 931, 937 (9th Cir.2011). "If probable cause remains after amendment, then no constitutional error has occurred." *Bravo,* 665 F.3d at 1084.

### 1. *Russell's Psychological Background and Credibility*

 Plaintiffs first contend that the PCW was misleading because it lacked information about Russell's history of psychological and mental health issues, current and past treatment, and cognitive function, which would have been relevant in assessing the credibility of his accusations. At the time she drafted the PCW, Lopez knew that Russell had a "history of aggressive behavior," was diagnosed as bipolar, identified as emotionally disturbed, was on four "psychotropic" medications, had a "history of hospitalizations," and was considered to have an intellect of an eight-year-old "with low average intellect" despite the fact he was twelve years old. (Powell Decl. Ex. N. at 1 (Docket No. 146–7).) Plaintiffs also complain that the PCW omitted the fact that the mandatory reporter who contacted CPS was Russell's therapist.

The PCW correctly noted that CPS learned of Russell's accusations of mis-

treatment at the Olvera/DeRose home through a "referral from a mandated reporter." Under California Penal Code section 1166, mandatory reporting of child abuse is required only "if the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter *knows or reasonably suspects* has been the victim of child abuse or neglect." Cal.Penal Code § 11166(a) (emphasis added). Thus, even if the PCW included the entirety of Russell's emotional and mental history and the fact that the mandatory reporter was his therapist, the magistrate would have been left with the strong inference that Russell's therapist—who was familiar with his emotional and mental history—reasonably suspected that Russell's account of what occurred was true.

Not only does the standard for mandatory reporting give rise to the inference that Johanna Gale, the therapist treating Russell who contacted CPS, did not believe Russell was lying, Lopez's notes also reflect that Gale told Lopez that Russell "has no history of excessive lying or making false allegations in any written service record or at current placement." (Powell Decl. Ex. N at 1.) It thus does not appear that Russell's treating therapist, who was familiar with Russell's mental and emotional history, believed that his history, diagnosis, or medications undermined his credibility. Nor has plaintiff cited authority establishing that a child's veracity in reporting abuse should be questioned solely because the child has a history of mental or emotional conditions similar to Russell.[8]

 The emotional and mental health of a child claiming abuse does not raise the

---

8. In his deposition, Dr. Ronald S. Federici testified about how an autistic child is "probably a little bit out there and is not going to be again credible, reliable, valid." (Federici Dep. 147:10–22.) His testimony, however,

was discussing a different child and linked to that child's autism. (*See id.* at 144:3–148:1.) Neither party has suggested that Russell was diagnosed with autism.

same concerns regarding that child's credibility as, for example, an informant's self-interested report of criminal activity. In *United States v. Hall*, 113 F.3d 157 (9th Cir.1997), the Ninth Circuit found that omission of a critical informant's prior conviction for making a false report to the police was material. Not only was the omitted prior conviction in *Hall* more directly linked to the informant's credibility than the omitted information in this case, the Ninth Circuit also emphasized that the police did not adequately corroborate his statements and that it was likely the informant was simply trying to "buy his way out of trouble by giving the police someone 'up the chain.'" *Hall*, 113 F.3d at 159–60. Unlike a self-interested informant, Russell's account is more akin to a citizen eye-witness or victim, whom courts generally presume to be reliable. *See Ewing*, 588 F.3d at 1224 ("[The witness] was a citizen witness, not an informant, and such witnesses are generally presumed reliable."); *United States v. Blount*, 123 F.3d 831, 835 (5th Cir.1997) ("'[C]itizen informants,' 'identified bystanders,' victims and crime scene witnesses may generally be presumed credible by police in a way that professional informants are not."). Plaintiffs also have not offered any evidence—let alone evidence known to Lopez at the time she prepared the PCW—suggesting that Russell had a motive to lie.

Nonetheless, Lopez indicated that she questioned the veracity of two of the more egregious accusations Russell made. First, Lopez recognized that Russell's statement to his therapist that he had been shackled to his bed and subsequent denial to Lopez that he had been shackled gave her some concern about Russell's credibility. (Lopez Dep. 163:11–18.) She speculated that Russell's account of the shackling may have derived from an incident in

Tracey that was "all over the media" where a minor child had recently been shackled in a foster home. (*Id.* at 162:24–165:4.) Second, Lopez testified in her deposition that she questioned whether a wound Russell showed her on his knee could have really been caused by a tazer or been from the time Russell lived at the Olvera/DeRose home. (*See id.* at 383:4–385:5.) When weighed against Russell's therapist's apparent belief of his account and indication that Russell did not have a history of lying, the omission of the aforementioned facts do not sufficiently undermine Russell's credibility so as to constitute misrepresentations.

Russell's account of what occurred at the Olvera/DeRose home also gained indicia of reliability when significant parts of his story were corroborated by DeRose and other children in the Olvera/DeRose home during the December 19, 2008, interviews. The corroborating evidence was disclosed to the magistrate in the PCW. For example, Russell's account that DeRose placed him in a cold shower was corroborated by DeRose's statement that she had Russell take cold showers when he had bowl movements on himself. (PCW at 2–4.) Russell's statement that he was "subjected to forcible physical restraints where he was held face down with his wrists behind his back" was corroborated by GD–O's statement that children at the Olvera/DeRose home are sometimes "'contained'" by the adults and that "Russell was often held down with his hands behind his back with Carla DeRose sitting next to him and Edward Hansen–Olvera standing over him." (*Id.*) DeRose also indicated that the children were at times required to lie face down on the floor while she sat next to the child or sat on the child if needed, and she indicated she had sat on Russell a number of times.[9] (*Id.*) Russell's

9. Plaintiffs take issues with the statement in the PCW that DeRose admitted to utilizing

"face down." Plaintiffs do not dispute that

indication that Olvera used a tazer on him was partly corroborated by GD–O's statement that there was a tazer device in the Olvera/DeRose home and that his parents had conducted a demonstration regarding "what it does to someone" and, although DeRose indicated that they no longer had a tazer in the home, she indicated that one had been present in the home when Russell lived there. (*Id.*) After determining that probable cause existed to support the removal of CHD–O, Lopez was not required to further corroborate Russell's statements. *See Ewing,* 588 F.3d at 1227 ("Once he has probable cause, an officer is not ordinarily required to continue to investigate or seek further corroboration."). Nonetheless, descriptions from other children and DeRose that were consistent with Russell's account increased the credibility of his statements and supported a finding of probable cause.

At the same time, however, the PCW omits statements by other children that arguably contradict Russell's account. Specifically, plaintiffs complain that the PCW omits the fact that Solla's interview notes indicated that RD–O "denied any inappropriate disciplining of Russell, or anyone else in the home" and SD–O "said no on [sic] here ever hurt Russell," that Russell was not "treated unfairly or differently than anyone else," and that "sometimes Russell had to be restrained to keep him from hurting anyone." (Powell Decl. Ex. GG at 1.) The PCW also omitted DeRose's denial that Russell or any child had been tazed or threatened with a tazer. (*Id.* Ex. HH at 9.) When weighed against other statements that corroborated Russell's account of what happened, the impressions about Russell's treatment by

these children or denial of abuse by De-Rose do not amount to misrepresentations and, even if they did, would not negate a finding of probable cause that CHD–O— who indicated that he was also required to do "face down"—was being subjected to potentially inappropriate discipline.

■ Moreover, even if a reasonable jury could find that the omissions misrepresented the credibility of Russell's account, the Ninth Circuit has repeatedly emphasized that the Fourth Amendment does not require inclusion of all exculpatory evidence, *see Beltran v. Santa Clara County,* 389 Fed.Appx. 679, 681 (9th Cir. 2010), and has upheld a warrant in the face of omitted evidence that contradicted statements in the warrant application. In *Ewing,* officers obtained a warrant to search plaintiffs' home for evidence of a murder based, in part, on an identification of plaintiffs by one witness. *Ewing,* 588 F.3d at 1226. The warrant application did not, however, include the fact that another witness did not identify plaintiffs when shown various DMV photos that included plaintiffs. *Id.* The Ninth Circuit concluded that, given the strength of the identification by the one witness, omission of a non-identification by another witness "does not cast doubt on probable cause." *Id.* at 1226–27 (citing *United States v. Colkley,* 899 F.2d 297, 301 (4th Cir.1990)). Similarly, given the evidence that corroborated significant portions of Russell's statements, the omission of potentially conflicting evidence in the form of other children's impressions of what they saw would not have precluded a finding of probable clause.

---

DeRose utilized the prone restraint technique that has been described as "face down," only that she referred to it as "containment," not "face down." (*See* Pls.' Opp'n to Cnty.'s Mot. at 60:15–18.) Because the technique is described in the PCW, the name used to de-

scribe the technique would not have affected a determination of probable cause. Moreover, because counsel and the witnesses most frequently refer to the technique as "face down," the court uses that title herein for clarity and consistency.

Lastly, the PCW also indicates that AGD–O "corroborated Russell W.'s statements regarding discipline" and includes descriptions she had given of "face down," holding by DeRose in the rocking chair, and children being sent to a "gray room." The statements are consistent with Lopez's notes of her interview with AGD–O at the school on December 19, 2008. (*See* Powell Decl. Ex. HH at 12.) In her deposition, however, AGD–O denied that she told any of the social workers about "face down" or a "gray room." (AGD–O Dep. 36:20–41:23.) The final sentence in that paragraph, which states that AGD–O said Russell and her were often sent to the "gray room" does not appear to have been memorialized in any interview notes and would seem factually impossible because AGD–O did not live in the home when Russell did and, when AGD–O lived with Olvera and DeRose, they lived in a different home than they did when Russell lived with them, (Olvera Dep. 286:2–10).

Similarly, the PCW stated that GD–O indicated that Russell was forced to take a cold shower when he had an " 'accident' " at night. Plaintiffs do not dispute that this statement is consistent with the notes of GD–O's interview. During his deposition, however, GD–O denied that he told any of the social workers that Russell or any other children were forced to take cold showers and indicated that the none of the social workers ever asked him about accidents. (GD–O Dep. 28:2–6, 70:24–72:11.)

Assuming the truth of AGD–O's and GD–O's deposition testimony, as the court must on summary judgment, the aforementioned statements in the PCW attributed to AGD–O and GD–O misrepresented what they said in their interviews and therefore those statements must be excised and probable cause must be supported without the statements. Nonetheless, these statements by AGD–O and GD–O were not critical to a finding of probable

cause for the removal of CHD–O and, while they corroborated some of Russell's accusations, deleting them from the PCW does not affect the other corroborating statements previously discussed. The alleged misrepresentations regarding AGD–O and GD–O were therefore not material to a finding of probable cause.

### 2. *Alleged Misrepresentations and Falsities in Russell's Account*

■ Plaintiffs first take issue with the statement in the PCW that DeRose made Russell "sleep in the bathtub with no pillow or blanket," (PCW at 2), when he had in fact told Lopez that he was eventually allowed to return to his room to sleep in a bed and was "sometimes" given a pillow or blanket, (Powell Decl. Ex. N at 3). The court doubts that a reasonable jury could find that this statement constituted a misrepresentation. Although plaintiffs interpret the statement in the PCW to mean that Russell was required to sleep in the shower *all night* and was *never* given a pillow or blanket, the statement more accurately is silent as to the duration of how long Russell slept in the shower and whether he always did so without a pillow or blanket. Even if plaintiffs' interpretation is adopted, however, the statement at most would be viewed as an exaggeration and it is hard to conceive how it would have had any effect on a finding of probable cause. *Cf. Ewing*, 588 F.3d at 1224.

■ Second, plaintiffs contend that the PCW erroneously indicated that Russell said he was "detained in closed areas *to the point* he would smear his feces." (PCW at 2 (emphasis added).) Although the "Emergency Response Referral Information" used this language, (*see* Powell Decl. Ex. X), Lopez's notes of her interview with Russell indicated that he nodded his head when asked whether he had to sleep in the shower *"because* he was smearing his feces," (*id.* Ex. N at 3).

Assuming that smearing fecal matter always preceded Russell having to sleep in the shower, the discrepancy between the two versions is apparent from the face of the PCW. In the following paragraph in the PCW, Lopez indicated that Russell also said that, "when he would have an uncontrolled bowel movement and would smear fecal matter," he was forced to sleep in the shower. (PCW at 3.) Lopez also indicated that DeRose said Russell "did spend a lot of time in the bathroom due to fecal smearing" and had to "take cold showers for having bowel movements on himself." (*Id.* at 4.)

The PCW also describes that Russell would "smear fecal matter" after he had an "uncontrolled bowl movement." (*Id.* at 3.) It does not appear that Russell ever told Lopez that he had "uncontrolled" bowel movements, but only indicated embarrassment as to why he had to sleep in the shower. In his interview with Moorer, CD–O also described Russell as intentionally "defecat[ing] in the room because he was mad." (Powell Decl. Ex. AA at 1.) Although placing Russell in the shower would seem more questionable if in fact his bowl movements were uncontrolled, it is unlikely a magistrate would have thought that *CHD–O* also had to sleep in the shower because nothing in the PCW suggests that he smeared fecal matter. Thus, even assuming the inclusion of "uncontrolled" amounts to a misrepresentation, correcting the PCW to reflect that Russell's bowl movements were intentional would not have affected a finding of probable cause.

■ What appears to be the most significant error in the account of Russell's experience is the PCW's statement that Russell indicated "he was shackled to his bed." (PCW at 2.) This statement appears to have been taken verbatim from the "Emergency Response Referral Information." (Powell Decl. Ex. X at 1.) Lopez's notes from her interview with Russell,

however, indicate that he "denied allegation that he was ever shackled to anything." (*Id.* Ex. N at 3.) Lopez also acknowledged that the discrepancy between Russell having told his therapist that he was shackled and then denying it to her gave her some concern about Russell's credibility. (Lopez Dep. 163:11–18.) The court finds that plaintiffs have at least shown that Lopez acted with a reckless disregard for the truth in omitting Russell's denial because the denial was made to her and memorialized in her notes.

The court must either assess whether probable cause remains after deleting the statement entirely or correcting the statement to indicate that Russell told his therapist he was shackled and then denied the shackling to Lopez. The latter correction appears to be the most accurate and favorable to plaintiffs because it could have alerted the magistrate to potential concerns about the credibility of Russell's account.

Addition of Russell's denial of having been shackled would have raised some doubt as to the credibility of his statements. It would not, however, have been "critical" to a finding of probable cause supporting the removal of CHD–O because the only discipline techniques directly linked to CHD–O were "strong sitting" and "face down." *See Ewing,* 588 F.3d at 1224. Even if the magistrate questioned Russell's credibility in indicating that those techniques were used in the home, the PCW contained other independent sources identifying the use of "strong sitting" and "face down," including CHD–O's indication that he was subjected to those forms of discipline and DeRose's recognition that those techniques were used in the home. Accordingly, the exclusion of Russell's denial of having been shackled was not material to a finding of probable cause supporting the removal of CHD–O and therefore

does not support plaintiffs' claim that the PCW was obtained through judicial deception.

▮ Plaintiffs next take issue with the sentence concluding the paragraphs about Russell in the PCW, which states: "The declarant asked Russell W. if he had seen any other children be subjected to the same treatment, he stated that two of the De Rose/Hansen–Olvera children were treater similarly." (PCW at 3.) Plaintiffs first complain that this statement neglects to identify the two children Russell identified as having been treated similarly, which were identified in a draft of the PCW as CD–O and SD–O. The court will therefore assume that a reasonable jury could find that the reference to the two other children could have led a magistrate to infer that CHD–O was one of those children. Plaintiffs have also shown that the decision not to identify CD–O or SD–O was at least reckless because, as a prior draft of the PCW identified them as the other children treated similarly, Lopez knew Russell was referring those children.[10]

Plaintiffs also complain that the PCW could be interpreted as suggesting that the other two children were also required to sleep in the shower, forced to take cold showers, and tazed. Of these acts, it is undisputed that CD–O and SD–O were subjected only to the last act identified in the paragraph ("face down").[11] When the PCW is read in its entirety, the court finds that a reasonable jury would not conclude that the sentence misrepresents that the other two children or CHD–O were forced to take cold showers, required to sleep in the shower, or tazed. First, as discussed in more detail below, the PCW clearly links Russell having slept in the shower and taken cold showers with his smearing fecal matter and the PCW does not suggest that CHD–O, or any other children, also smeared fecal matter. Second, the PCW limits the discipline that CHD–O and the other children claim they experienced to "strong sitting" and "face down" and does not suggest that they were tazed.

Lastly, it is worth noting that the court does not find that Russell's account of what he experienced in the Olvera/DeRose home, in itself, gave rise to probable cause

10. Excerpts of the draft PCW could have been removed by County counsel or other individuals for any number of reasons and the court can only speculate as to those reasons. For example, the draft PCW has a lengthy paragraph about Lopez's conversations with Sutie Wheeler, District Manager for Adoption Services. The paragraph could have been removed because, as plaintiffs suggest, it indicates Wheeler had "worked with the [Olvera/DeRose] family for many years and she believed they offered significant services to assist children that had been previously adopted." (Powell Decl. Ex. Q at 7.) It could also have been removed because it recounted several statements Lopez made to Wheeler about exposing the state to liability for having referred a family to an unlicensed home. (*Id.*) It could also have been removed for entirely different reasons.

The court does not speculate as to why changes reflected in the final PCW were made

or find that plaintiffs have made a substantial showing of an intentional or reckless disregard for the truth because of the changes. The court relies on the draft PCW only to show what was within Lopez's knowledge when preparing the PCW.

11. Plaintiffs also argue that the PCW is flawed because it omits CD–O's and SD–O's impression of "face down," namely that it was a technique for a child to calm down and it did not make them feel threatened. The addition of the fact that CD–O and SD–O did not share the similar negative impression of "face down" as Russell appeared to have neither negates the veracity of Russell's statement that he was subjected to the other forms of discipline or would have precluded a magistrate from concluding that there was a fair probability that the use of those techniques posed a threat to CHD–O's health or safety.

to remove CHD–O. Russell's account of what occurred provided a background of why CPS initiated an investigation of the Olvera/DeRose home, painted what could be viewed as an overall concerning picture of what occurred in the home, and described one of the discipline techniques ("face down") that CHD–O reported being subjected to.

### 3. *Discipline Techniques*

#### a. *"Strong Sitting"*

■ The PCW recounts DeRose as having described "strong sitting" as "a technique utilized by practitioners of Attachment Therapy, where children must sit silently cross-legged with their arms down on the sides of their body supporting their weight." (PCW at 4.) Plaintiffs contend that the latter part of this description is false as neither DeRose nor any of the children indicated that "strong sitting" required the children to support their weight with their arms. In her deposition, Lopez explained that this description of "strong sitting" came from her interview with another child in which he did a physical demonstration of the technique. (Lopez Dep. 284:19–21.) She testified that, during the demonstration, AND–O did not "lift his entire body up" and that his "buttocks or legs did not lift from the floor" but "basically [ ] supported his weight with his arms straight down." (*Id.* at 284:22–285:2.) The issue is thus whether a reasonable jury could find that the description of strong sitting as requiring the children to "support[ ] their weight" misrepresents the fact that the children were not required to lift, or attempt to lift, their body off the ground and thereby support their entire body weight with their arms.

Based on the inclusion of "supporting their weight" in the PCW along with the description of the technique described as "strong" sitting, a reasonable jury could find that "strong sitting" required the children to attempt to lift their body weight while in a seated position. Defendants argue that, regardless of whether the technique demanded this of the children, the technique was one of the techniques Dr. Carmichael found concerning. The PCW did not, however, indicate that Dr. Carmichael had reviewed the use of the technique or elaborate why the technique was harmful. Dr. Carmichael's description of "strong sitting" also did not suggest that the children had to support their body weight. (*See* O'Dea Decl. Ex. J ("Multiple children described similar interventions such as 'strong sitting' (i.e., sitting with demanded posture, with palms on floor, and eyes closed or covered with an eyemask).").)

It is unlikely that a magistrate reviewing the PCW would have been familiar with techniques used by "practitioners of Attachment Therapy," and thus would be relying on the PCW to inform his or her decision as to whether use of the technique posed a risk to CHD–O's health or welfare. A reasonable jury could conclude that the inclusion of "supporting their weight" misrepresented the technique so as to mislead a magistrate into viewing the technique as requiring the children to attempt to physically lift their body while sitting. Based on the absence of any reference to being required to support one's weight in the children's and Dr. Carmichael's descriptions of "strong sitting" and Lopez's testimony that the demonstration she observed of the technique did not require the child to lift his body off the ground, plaintiffs have established a genuine issue of material fact with respect to whether Lopez acted with at least a reckless disregard for the truth in drafting the description of "strong sitting." The court must therefore delete this language from the PCW and assess its materiality.

#### b. *"Face Down"*

■ Although the PCW describes "face down" in a way that the court does

not find to materially misrepresent what occurred, the PCW primarily leaves it for the magistrate to determine whether it was fairly probable that the use of the technique endangered CHD–O's health or welfare. Although Lopez had obtained a professional opinion letter from Dr. Carmichael concluding that the discipline techniques utilized in the home, including "face down," posed a risk to the children's safety, Lopez did not refer to Dr. Carmichael's review, letter, or opinion in the PCW.

In addition to describing "face down" in the PCW, Lopez concluded that Olvera and DeRose used "excessive and harmful forms of discipline." (PCW at 5.) A magistrate would be likely to assume that this conclusion extends to the use of "face down" and would likely find it significant that a social worker viewed the technique as "excessive and harmful." The magistrate was not informed, however, that Lopez herself utilized the technique that has been described as "face down" when she worked in the Sacramento Children's Home ("SCH"). (*See* Lopez Dep. 33:7–35:3, 164:8–23.) Undoubtedly, a reasonable jury could find that the description of "face down" as "excessive and harmful" without mention of the fact that the same technique was lawfully utilized at SCH misrepresented the potential harm CHD–O faced from the technique.

In her deposition, Lopez explained that what made the use of the technique acceptable at SCH and excessive in the Olvera/DeRose home was that SCH was licensed and subject to oversight whereas the Olvera/DeRose home was unlicensed and therefore not subject to oversight or mandatory training. (*Id.* at 164:23–165:10, 166:17–167:5.) The fact that the Olvera/DeRose home was unlicensed, however, was omitted from the PCW and thus, even assuming Lopez's distinction has merit, the PCW did not purport to gain protective custody of CHD–O based on the

fact that the Olvera/DeRose home lacked a license. A reasonable jury could find that the omission of the use of "face down" at SCH misrepresents the potential harm of the technique. Plaintiffs have shown that Lopez was at least reckless in propagating this misrepresentation because she knew the technique was used in licensed facilities and, despite relying on the lack of a license to find that use of the technique was inappropriate in the Olvera/DeRose home, did not indicate in the PCW that Olvera and DeRose lacked a license. The court must therefore correct the PCW to indicate that the "face down" technique is utilized in licensed children's homes and assess the materiality of the omission.

### c. Materiality Re: Discipline Techniques

After the aforementioned corrections are made, the information in the PCW would still lead a magistrate to find it probable that CHD–O was subjected to the "strong sitting" and "face down" discipline techniques. The issue, however, is whether the PCW contained sufficient evidence for a magistrate to find probable cause that the use of those techniques endangered CHD–O's health and welfare. Although it is debatable, the court assumes that requiring children to attempt to support their body weight when "strong sitting" could be viewed as harmful. If, however, "strong sitting" was presented as only a discipline technique in which "children must sit silently cross-legged with their arms down on the sides of their body," it is difficult to conclude that a magistrate would have believed that this technique was excessive or harmful to CHD–O's health or welfare.

With "face down," the description of the technique, along with Lopez's indications that it is an "excessive and harmful form[ ] of discipline," likely supported the magistrate's finding of probable cause. The risk

of harm to CHD–O's health or welfare from the technique would have been less apparent, however, if the magistrate was told the same technique is utilized at licensed facilities. Although the licensing and oversight of those facilities could prevent the improper or excessive use of the technique, Lopez herself testified that the technique was administered in the same fashion as at the Olvera/DeRose home and the PCW attacks the mere use of the technique, not that it was used excessively or improperly. With knowledge that the technique was considered acceptable at licensed homes, a magistrate would have at least questioned or required additional information addressing whether the use of the technique without any allegation that it was being used improperly was harmful to CHD–O's health or welfare. *Cf. Bravo,* 665 F.3d at 1086.

#### 4. *Alleged Sexual Abuse of CHD–O*

One of the most significant allegations in the PCW giving rise to probable cause and the only allegation of misconduct that is unique to CHD–O is the alleged sexual abuse. The PCW states:

> Social worker Solla asked [CHD–O] if anything has ever happened to him that was not okay. [CHD–O] said yes. [CHD–O] said that a child in the home by the name of [SD–O] [12] rubbed his privates. [CHD–O] said he was lying on the floor in "Ma'am's" room near the bathroom door. [SD–O] lay next to him and she rubbed his penis over his clothes. Social worker Solla asked what he was wearing, and he said "clothes like this." [CHD–O] was wearing a tee-shirt and sweatpants. Social Worker Solla asked [CHD–O] if he said anything to

[SD–O]. [CHD–O] said he told her to stop but she would not, and she replied "sex is fun." Social Worker Solla asked [CHD–O] if he told anyone and he said he told "Ma'am". When asked what Ms. DeRose's response was, [CHD–O] said "Ma'am said she would know if it was true or not, and she didn't believe me".

(PCW at 4.) The PCW also indicates that "DeRose was confronted regarding the allegation made by the child, [CHD–O], of being sexually abused by another child in the home, [SD–O]. Ms. DeRose admitted to being aware of the allegation but stated that when it was told to her, she didn't find that it was possible." [13] (*Id.*) This is the only allegation of sexual misconduct in the PCW and the final paragraph of the PCW concludes, "the child has disclosed sexual abuse in the care provider's home, yet Ms. DeRose does not believe the child and has allowed the alleged perpetrator to remain in her home and access to the child [sic]." (*Id.* at 5.)

The account of the sexual misconduct by SD–O in the PCW is taken, almost verbatim, from Solla's notes of her interview with CHD–O on December 19, 2008. What is absent from the PCW, however, is the fact that, after Solla interviewed CHD–O, Deputy Lemus also interviewed CHD–O to follow-up on the claim of sexual abuse. In his report, Deputy Lemus memorialized that CHD–O made the following statement to him:

> There is one time that I can think of that I was touched in a bad way. I think it was maybe a month ago when [SD–O], who is 11, and I were talking to each other. I was on time out for acting

---

**12.** Although many of the exhibits refer to the child as "SD," defendants confirmed at oral argument that S–D and SD–O are the same child.

**13.** Although the PCW states that "DeRose admitted to being aware of the allegation," Lo-

pez testified in her deposition that, when she discussed the alleged incident with DeRose, DeRose "stated that what she had been told was not what had been reported by the children to either social worker Solla or to Deputy Lemus." (Lopez Dep. 295:16–21.)

out, and Mam had me in the bathroom with the door closed. I lay down on the bathroom floor, and I was next to the door, and I was talking through the door to [SD–O] and I [sic] at first were talking about our Spanish lessons that we had taken in our home-school class. I knew it was [SD–O] by her voice when she was talking to me, and she was also lying down right next to the door.

[SD–O] then told me a joke about sex, but I don't really remember how the joke went. [SD–O] and I kept talking, and then [SD–O] told me, "I want to have sex with you," and she reached underneath the door with her right hand and used her middle finger to rub my private." My private is right here. I told [SD–O] to stop talking to me about sex and to stop touching me. [SD–O] stopped touching me, and we kept talking about our Spanish lessons some more.

After I got off the time out, I told Mam about what [SD–O] did to me. Mam then talked to me about it to make sure I was okay, and that I would be alright. Other than that, I am okay. [SD–O] has only touched me that one time, and no one else has ever touched me or made me feel scared or uncomfortable.

I have not seen [SD–O] touch any of the other kids who live here. [SD–O] and I get along good. I am not scared of [SD–O]. I just didn't like how she touched my private that one time.

(Powell Decl. Ex. P at 5.) The more detailed account CHD–O gave to Deputy Lemus was consistent with DeRose's statement that the alleged sexual misconduct could not have occurred because the children were on opposite sides of the bathroom door. CHD–O also described this incident to Deputy Lemus as the *"one time that I can think of that I was touched in a bad way."* (*Id.* (emphasis added).) [14]

▪ Defendants contend that the incident reported to Deputy Lemus was omitted from the PCW because Lopez was unaware of it at the time she prepared the PCW. However, "[i]n reviewing the materiality of challenged omissions, [the court] accept[s] as true the facts alleged by the [plaintiffs]." *Liston,* 120 F.3d at 973. Plaintiffs have submitted sufficient evidence that at least establishes a genuine dispute as to whether Lopez knew about the account CHD–O told Deputy Lemus. First, at a detention hearing shortly after the issuance of the PCW, DeRose testified:

A second intervention by the police was Miss Lopez told me that and the police officer that [CHD–O] had alleged he had been sexually assaulted by [SD–O]. I explained that circumstance in front of the police. Miss Lopez insisted that I should have reported that and that there was more. She wasn't willing to say there was more, what that more might be. The police officer took [CHD–O] in the other room and interviewed him. Came out again and said there's nothing here. You have nothing other than what the mom has already told you. They had a pretty heated discussion.

(Powell Dec. Ex. II at 226.) Second, Lopez also testified in her deposition that,

---

**14.** For the fist time in their reply, defendants discuss Deputy Takahashi's report from his interview with SD–O on December 19, 2008. According to his report, SD–O reported an incident in which she touched CHD–O's penis over his clothes while they were in the bathroom with other children. (Powell Decl. Ex. P at 6.) SD–O's account of the events leading up to this incident vary significantly from either of CHD–O's accounts. Although SD–O's account of what occurred would lend support for a finding of probable cause to take CHD–O into protective custody based on alleged sexual abuse, defendants do not contend that Lopez was aware of SD–O's account to Deputy Takahashi when she prepared the PCW.

when she discussed the alleged incident with DeRose, DeRose "stated that what she had been told was not what had been reported by the children to either social worker Solla *or to Deputy Lemus."* (Lopez Dep. 295:16–21 (emphasis added).) This explanation at least suggests that Lopez was aware that CHD–O had spoken about the alleged incident with Deputy Lemus. Lastly, Deputy Lemus testified that, based on how such investigations typically occur, after he and Deputy Takahashi interviewed the children, they "may have had a conversation apart from the social workers, but . . . [it would be] a fair statement that we conferred without the social worker as well after." (Lemus Dep. 37:1–7.) [15]

The PCW also relied on DeRose's alleged inappropriate response to CHD–O's claim of sexual misconduct to support probable cause. The PCW stated that "DeRose admitted to being aware of the allegation [of sexual misconduct] but stated that when it was told to her, she didn't find that it was possible." (PCW at 4.) In the final paragraph, the PCW concludes, "[CHD–O] has disclosed sexual abuse in the care provider's home, yet Ms. DeRose does not believe the child and has allowed the alleged perpetrator to remain in her home and [have] access to the child." (*Id.* at 5.) Inclusion of the incident as CHD–O reported it to Deputy Lemus, which is consistent with the incident as DeRose claims it was told to her, would have illuminated why DeRose concluded that it was not possible and made her inaction seem less inappropriate.

The court therefore concludes that, assuming Lopez was aware of the account of

inappropriate touching that CHD–O told Deputy Lemus, her exclusion of that account from the PCW misrepresented what CHD–O claimed occurred and the reason for DeRose's determination that the event was not possible. Although there is a genuine dispute about whether Lopez knew about the account CHD–O reported to Deputy Lemus, when considered in light the light most favorable to plaintiffs, a jury could conclude that Lopez acted with at least a reckless disregard for the truth. The court must therefore supplement the PCW with the account CHD–O reported to Deputy Lemus and determine whether the omission was material.

As reported in the PCW, a magistrate had little reason to question whether the alleged inappropriate touching of CHD–O occurred as he claimed it did. *Cf. United States v. Banks,* 539 F.2d 14, 17 (9th Cir. 1976) ("A detailed eyewitness report of a crime is self-corroborating; it supplies its own indicia of reliability. The details of his statement supported an inference as to the reliability of his information and his credibility."). However, if the magistrate was also informed of the more detailed account CHD–O reported to Deputy Lemus, the magistrate would have questioned whether the claimed misconduct actually occurred. Inclusion of the account told to Deputy Lemus would also have illuminated why DeRose concluded that the incident was not possible and made her allegedly insufficient response to CHD–O's claim of sexual abuse seem more reasonable. When the allegation of sexual misconduct and DeRose's inadequate response to it were one of the central allegations related to CHD–O that supported the PCW, the

---

**15.** Without citing to any evidence, plaintiffs also claim that, after Deputy Lemus interviewed CHD–O, DeRose took Deputy Lemus and Lopez to the bathroom where the alleged incident occurred to demonstrate the impossibility of SD–O having reached under the bath-

room door. Deputy Lemus does not recall whether such a demonstration occurred, (Lemus Dep. 28:20–24), and Lopez denies that she observed any such demonstration, (Lopez Dep. 294:10–23, 295:22–25).

court finds that omission of significant details CHD–O reported to Deputy Lemus would have caused a magistrate to question the allegations and require more evidence before concluding that there was a fair probability that CHD–O's health or safety was endangered based on alleged prior sexual misconduct by another child in the house and DeRose's inadequate response to it.

### 5. Absence of Interviews of Other Children and Their Exculpatory Statements

Plaintiffs contend that, during the December 19, 2008, interviews, each of the children interviewed indicated that they felt safe, happy, comfortable, or protected in the Olvera/DeRose home, but the PCW omitted these statements. When describing the interview with CHD–O, however, the PCW states, "[CHD–O] reported that he feels safe at the home." (PCW at 4.) As the PCW was seeking the removal of CHD–O from the home, the fact that CHD–O felt safe was the most relevant exculpatory statement and would also carry more weight than similar statements by other children.

Moreover, at least two of the children's statements about feeling safe are not as exculpatory as plaintiffs suggest. Specifically, Solla's notes of her interview with K.A.M. reflect that she told Solla "that Maam told them to tell [the social workers] that they are safe and to say that they weren't hit or harmed." (Powell Decl. Ex. GG at 3.) Solla's notes also reflect that K.T. said that "Maam told the kids to say that they don't use any weapons' in the home." (Id.) Nonetheless, even assuming that the children's statements about feeling safe had exculpatory value, when considered in light of the inclusion of CHD–O's statement that he felt safe and weighed against the allegations in the PCW, exclusion of statements by all of the children that they felt safe would not "pre-

vent technically true statements in the affidavit from being misleading." Liston, 120 F.3d at 973.

Plaintiffs also generally object to Lopez's failure to include the fact of how many children were interviewed on December 19, 2008, and the content of their interviews. The court has specifically examined any omission from the other children's interviews that plaintiffs contend would have been material to a finding of probable cause. Defendants were not required to present all of the evidence obtained and the mere inclusion of the other children's interviews would not have been material to a finding of probable cause to remove CHD–O.

### 6. Omission of Information about the Children the Olvera/DeRose Program Served and Support Letters

Plaintiffs further contend that the PCW was obtained through deceit because it omitted information about the nature of the child population the program was serving, including the children's emotional and behavioral issues. The PCW was not, however, silent as to the fact that CHD–O had emotional and behavioral issues. The PCW recited that Morrison and Miess placed CHD–O in the Olvera/DeRose home "due to their inability to care for the child in that 'he had become consistently and completely non-compliant with [them], sexually aggressive with their younger son and violent both at preschool and at home.'" (PCW at 4.) The PCW also included ANG–O's description that a child was subjected to "face down" if the child was "violent in the home." (Id. at 3.) It is therefore unlikely that the reviewing judge would have believed that CHD–O or other children in the home did not suffer from emotional and behavioral issues.

Moreover, based on the investigation Lopez had performed, the evidence would not have supported the inference that the

techniques used in the Olvera/DeRose home were acceptable simply because of the children's emotional and behavioral issues. Most significantly, prior to seeking a PCW, Lopez sought and obtained an opinion letter from Dr. Blake Carmichael, the Manager of the Methal Health Services CAARE Center at U.C. Davis Children's Hospital. Lopez requested Dr. Carmichael's opinion on the effects of the treatment practices utilized in the Olvera/DeRose home "on children with a prior history of abuse or neglect." (O'Dea Decl. Ex. J at 1.) He concluded that, "[a]fter carefully reviewing all of these materials, it is my opinion that the treatment/parenting practices identified in the documentation noted above, are cause for great concern with regard to the psychological, emotional, and physical well being of children." (*Id.* at 4.) Although Dr. Carmichael's opinion letter was not included in the PCW, his conclusions undermine plaintiffs' apparent assumption that the inclusion of the children's emotional and behavioral issues would have served an exculpatory value or affected the probable cause determination.

Plaintiffs next object to the omission of any reference to the numerous positive letters Lopez was provided from parents who currently or previously had children in the Olvera/DeRose home and from other individuals, including a therapist, that emphatically tout the success and importance of the program. While representations from those individuals that the Olvera/DeRose program was successful and safe conflict with Lopez's conclusions about the program, the exclusion of conflicting evidence does not necessarily negate a finding of probable cause. *See Ewing*, 588 F.3d at 1226–27. Nor does evidence that the program is successful in modifying the children's behavior necessarily give rise to the inference that the techniques utilized to modify their behavior are safe. Moreover, Dr. Carmichael considered each of the letters when preparing his opinion letter and their support for the program did not affect his conclusion that the techniques were harmful. At most, the letters show that parents and other individuals disagreed with Lopez's conclusions about the program, not that Lopez made material misrepresentations by omitting them from the PCW.

### 7. *Remaining Alleged Misrepresentations and Falsities*

Plaintiffs object to the inclusion of the statement that Olvera and DeRose were "inappropriate" care providers in the first sentence of the PCW. This statement, however, conveys the conclusion that Lopez had reached and was supported by evidence she had obtained. It was clearly an opinion of the social worker, not a misrepresentation of information. Plaintiffs also object to the exclusion of Olvera's and DeRose's extensive mental health training and experience with severely emotionally disturbed children and adults. While inclusion of the evidence may have painted a more complete picture of Olvera and DeRose, omission of their credentials or experience did not "prevent technically true statements in the affidavit from being misleading." *Liston*, 120 F.3d at 973. The mere fact that Olvera and DeRose had extensive training and experience would not give rise to the inference that they were incapable of providing "inappropriate" care for children that endangered their health or welfare.

Plaintiffs next complain that the PCW did not mention the extensive camera surveillance system in the home that was used to monitor the children even though the monitoring system was described in the draft PCW. Plaintiffs concede that the presence of the video monitoring system is not "on its face exculpatory." (Pls.' Opp'n to Cnty.'s Mot. at 35:20.) Moreover, while

plaintiffs suggest favorable inferences that could have been drawn given the presence of the monitoring system, such as the lengths Olvera and DeRose went to in order to ensure the children's safety, such evidence could equally give rise to unfavorable inferences, such as the use of video cameras to replace adequate adult supervision. Ultimately, omission of the evidence about the video monitoring system did not amount to a misrepresentation, let alone a material misrepresentation.

Lastly, plaintiffs dissect numerous other statements in the PCW. (*See id.* at 42 (when Russell was forced to take cold showers), 43 (omission of what Russell felt when tazed), 44 (use of the word "forcible"), 45 (omission of fact that a child could still breathe when in "face down"), 47 (omission of how the restraints made Russell feel), 51 (addition of "to someone" to GD–O's statement that there was a tazer demonstration to show "what it does"), 62 (how DeRose actually described "sitting" on a child during "face down"), 63 (inclusion of Miess's statement that they were "more than thrilled that Carla and Ed want to adopt [CHD–O]").) It suffices to say that most of these arguments appear to be more of a play on words by plaintiffs than a demonstration of misrepresentations or falsehoods. To the extent a reasonable jury could find that one or more of these distinctions amount to a misrepresentation, the court finds that none of them would have any effect on a finding of probable cause. Moreover, it cannot be overlooked that the PCW was for the removal of CHD–O, not Russell. While Russell's statements illustrate how CPS's investigation of the Olvera/DeRose home began and paint an overall picture of the Olvera/DeRose program, all of details of his experience were not necessary to a finding of probable cause that CHD–O faced harm due to the discipline techniques and alleged sexual misconduct. Moreover, with the exception of Russell's

statement that two other children were "subjected to the same treatment," the PCW leaves the impression that many of Russell's experiences were unique to him.

■ In many of these arguments, plaintiffs also overlook the fact that the Ninth Circuit has previously explained that the Fourth Amendment does not "require that a warrant affidavit include any information a plaintiff deems favorable to his or her cause." *Beltran,* 389 Fed.Appx. at 681. An omission from a warrant challenged based on judicial deception is material only if it "renders an otherwise truthful statement to be false or misleading." *Id.* "[T]he omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed ...." *United States v. Craighead,* 539 F.3d 1073, 1081 (9th Cir. 2008).

### 8. *Conclusion*

The court finds that plaintiffs have established a genuine issue of material fact whether Lopez, Schrage, Travis, and Guillon acted at least recklessly in making three material misrepresentations or omissions in the PCW: 1) inclusion of "supporting their weight" in the description of "strong sitting"; 2) omission of the fact that the "face down" technique is utilized at licensed children's homes; and 3) omission of CHD–O's conflicting account of the alleged sexual abuse as reported to Deputy Lemus. To withstand summary judgment, the corrected PCW must "compel the conclusion that 'a neutral magistrate would not have issued the warrant.'" *Smith v. Almada,* 640 F.3d 931, 938 (9th Cir.2011).

What is most troubling about the three aforementioned omissions is that they relate to the only allegations of mistreatment that are directly linked to CHD–O. When

the PCW is supplemented to more accurately describe "strong sitting," the acceptable use of "face down" in licensed homes, and the account of the alleged sexual abuse told to Deputy Lemus, the ability of a magistrate to find it fairly probable that CHD–O's continued residence at the Olvera/DeRose home endangered his health or welfare is significantly depleted. As the Ninth Circuit has explained, by "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *Liston*, 120 F.3d at 973 (internal quotation marks and citation omitted). Here, the misrepresentation and omissions would have significantly manipulated the inferences the magistrate would have drawn about the likelihood CHD–O would face harm if he remained at the Olvera/DeRose home, especially because these omissions undermined the only evidence of mistreatment that was particular to CHD–O.[16]

Setting aside the "strong sitting," "face down," and alleged sexual abuse, the remainder of the allegations of mistreatment in the PCW are unique to other children and mostly pertain only to Russell, who no longer lived at the home. While the overall depiction of Russell's account raises serious questions about what was occurring at the Olvera/DeRose home, the most significant allegation of shackling is also called into question once the PCW is corrected. Moreover, even if the allegations in the PCW were sufficient to support a finding of probable cause that Russell's health and welfare were endangered when he was in the Olvera/DeRose home, this

finding cannot be simply transferred to CHD–O without any indication that CHD–O posed similar behavioral problems, such as fecal smearing.

Overall, when the PCW is corrected to accurately reflect the evidence in Lopez's knowledge about "strong sitting," "face down," and the allegation of sexual abuse, the court finds that, under the totality of the circumstances, a neutral magistrate who was doing his or her job properly would not have issued the PCW without, at a minimum, requiring additional information to determine whether remaining in the Olvera/DeRose home made it probable that CHD–O's health and welfare would be endangered. Plaintiffs have therefore sufficiently established a genuine issue of material fact on their claim that the PCW was obtained through judicial misrepresentation in violation the Fourth Amendment. Accordingly, the court the will deny defendants' motion for summary judgment on CHD–O's second claim under § 1983 for violation of his Fourth Amendment right.

### 4. *Monell Claims*

 "A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, —— U.S. ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (citing *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Because

---

**16.** In their reply, defendants explain that the risk of future harm CHD–O faced was based on "the circumstances under which CHD–O had been left in the home, the activities being conducted in the home, the presence of other violent children who needed to be physically restrained, and the use of controversial attachment therapies to treat these children." (Cnty.'s Reply at 20:11–16.) The "circumstances under which CHD–O had been left in

the home," as described in the PCW are not sufficient to support a finding of probable cause necessitating taking him into protective custody. Similarly, the PCW neither indicates nor suggests that other violent children in the home posed a risk to CHD–O's health or safety. Thus, the use of "face down," "strong sitting," and sexual abuse are the only allegations in the PCW directly linked to CHD–O's health or welfare.

§ 1983 does not impose vicarious liability, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.*

 "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* at 1359. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 131 S.Ct. at 1360.

 "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409, 117 S.Ct. 1382). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* In *Canton*, however, the Court did not foreclose the possibility that, "in a narrow range of circumstances," *Bd.*

*of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409, 117 S.Ct. 1382, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 131 S.Ct. at 1361.

 Here, plaintiffs contend that Sacramento County provided inadequate training in the inclusion of exculpatory evidence in protective custody warrants and "what the law requires of government actors preparing and submitting a warrant to invade another persons [sic] familial association and/or rights of privacy." (Pls.' Opp'n to Cnty.'s Mot. at 79:7–15.) Plaintiffs have neither alleged nor produced evidence establishing a "pattern of similar constitutional violations" or even a single similar constitutional violation. At most, plaintiffs established that none of the deposed social workers recall an instance of another social worker having been disciplined for failing to exclude exculpatory evidence in a protective custody warrant application. In the absence of any evidence that prior violations have occurred, evidence of a lack of discipline of employees does not give rise to the reasonable inference that violations occurred, let alone that there had been a pattern of similar constitutional violations. Plaintiffs must therefore pursue their *Monell* claim under the "single-incident theory" and establish a triable issue of fact whether the Fourth Amendment violation CHD–O allegedly suffered was a "plainly obvious consequence" of failing to adequately train social workers about preparing protective custody warrant applications and including exculpatory evidence.

As a threshold matter, although plaintiffs argued that the PCW contained numerous omissions and misrepresentations, the court found that plaintiffs' Fourth Amendment claim of judicial misrepresen-

tation in obtaining the PCW could withstand summary judgment on only three theories: 1) describing "strong sitting" as requiring children to "support[ ] their weight"; 2) omitting the fact that the "face down" technique was used at SCH; and 3) omitting CHD-O's account to Deputy Lemus about the alleged sexual misconduct. Sacramento County's *Monell* liability and plaintiffs' failure to train claim are therefore limited to those theories as well. *See Long v. City of Honolulu,* 511 F.3d 901, 907 (9th Cir.2007) ("If no constitutional violation occurred, the municipality cannot be held liable and whether 'the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.'" (quoting *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986))).

Defendants have submitted significant evidence regarding Sacramento County's training program on protective custody warrant applications. Schrage began working for Sacramento County CPS in 1986 and held several positions within the Emergency Response unit and has been a program manager since 2001. (Schrage Dep. 18:3–5, 19:6–20:2, 26:3–27:3, 29:13–14.) As a program manager, Schrage's responsibilities included "ensuring that policies and procedures are followed and guidelines, training," which included internal training within the department and mandatory outside training. (*Id.* at 31:2–20.)

Schrage testified that she and her staff were required to attend training on protective custody warrants and that she had attended a training on protective custody warrants prior to February 2009. (*Id.* at 38:10–12, 39:5–7, 40:2–5.) She indicated that "information was provided in the training by County counsel about protective custody warrants, including information about the process and what is contained within a protective custody

warrant" and that they were trained that "[i]nformation contained in the warrant needed to include all relevant facts that would be presented to County counsel for their review." (*Id.* at 40:5–11, 41:10–17); *see also id.* at 43:23–44:3 ("What I recall from the training is that we—we and I—as the Department are required to inform the court of all information—of information known during the course of our investigation when we are going forward with requesting an application for a protective custody warrant, that we are required.") Schrage answered affirmatively when asked, "The training you attended, did it indicate to you that a relevant fact, even if a fact which when considered was contrary to the idea that a child was at some substantial risk of harm, had to also be included?" (*Id.* at 44:11–16.)

Lake, who began as a social worker with CPS in 1987 and received numerous promotions until she became the division manager of Family Reunification and Court Services in 2007, (Lake Dep. 23:4–9, 42:5–21), testified that when CPS began the practice of seeking protective custody warrants in November 2008, training was provided at that time and continued to be provided as the process and procedures in seeking protective custody warrants evolved. (*Id.* at 31:3–6, 32:1–10, 49:11–19.) Lake testified that mandatory training was developed by the program planner and County counsel, included written materials and a Power Point presentation, and "addressed what the different steps and responsibilities were involved in obtaining a warrant." (*Id.* at 49:21–50:1, 53:13–22, 54:10–15, 62:4–13.) She further testified that the training covered the "legal sufficiency" of protective custody warrants and addressed what information was required to be included, but she could not recall whether social workers were specifically instructed to include exculpatory evidence.

(*Id.* at 55:14–17, 59:17–60:6, 61:25–62:7, 62:24–63:7.)

Coulthard, who began in the Emergency Response Program of Sacramento County CPS in 1985 and received several promotions before becoming a division manager of CPS in 2007, (Coulthard Dep. 26:15–16, 28:15), testified that in 2007 or 2008 the social workers received training on the existence of protective custody warrants and how and when to obtain them, (*id.* at 32:23–33:15).

Plaintiffs argue that Schrage's testimony reveals the inadequacy of the training because, even though she testified that the training addressed the inclusion of exculpatory evidence, she could not provide an accurate definition of "exculpatory." (*See* Schrage Dep. 40:19–42:25, 43:6–16; *see also* Schrage Dep. 42:9–17 (testifying that she believed "exculpatory" meant "information statements from another party received when conducting the investigation"). Schrage's inability to define the term "exculpatory" does not, without more, create a genuine issue of material fact with respect to whether the training program was inadequate. The Fourth Amendment does not require that all exculpatory evidence be included; it only prohibits material misrepresentations or omissions. *See Beltran*, 389 Fed.Appx. at 681. Schrage testified that she was trained to include all "relevant" information, including facts that were "contrary to the idea that a child was at some substantial risk of harm." This standard would include material exculpatory information and is therefore consistent with what the Fourth Amendment requires.

Coulthard was also unfamiliar with the term "exculpatory," but she had testified that she did not attend training on protective custody warrants because, as a division manager, her duties did not include preparing or submitting protective custody warrants. (Coulthard Dep. 33:18–24,

68:20–23.) Lake appeared to generally understand that "exculpatory" evidence referred to information that "mitigated or changes what you had presented [to the court]" and only seemed mistaken that it referred to evidence discovered after facts had already been presented to the court or a family. (*See* Lake Dep. 60:7–25.)

Plaintiffs also contend that the training was inadequate because Schrage did not recall whether any of the training included the content of Government Code section 820.21. Section 820.21 precludes social workers from receiving certain state statutory immunities if the social worker maliciously commits perjury, fabricates evidence, fails to disclose known exculpatory evidence, or obtains testimony by duress, fraud, or undue influence. Cal. Gov't Code § 820.21. In questioning Schrage about section 820.21, counsel did not allude to the content of the section during her deposition, but merely asked her if she had training on "section 820.21." (*See* Schrage Dep. 49:11–19.) The mere fact that Schrage was not familiar with the section by number does not give rise to a reasonable inference that the training did not did not instruct social workers that information in a protective custody warrant application must be truthful. Moreover, even if the training did not cover section 820.21, this omission alone does not create a genuine issue of material fact that the entirety of the training was inadequate.

The only testimony plaintiffs have provided that is potentially inconsistent with the aforementioned testimony about Sacramento County's training program came from Cullivan. Cullivan began working with Sacramento County CPS in April 2007 as a juvenile court investigator. (Cullivan Dep. 31:1–14.) As a juvenile court investigator, Cullivan became involved in a case after a child had been removed, and thus only prepared a protec-

tive custody warrant in one case because she determined that other children in the house also needed to be removed. (*Id.* at 48:23–49:21.) Cullivan testified that she received training on preparing protective custody warrants and she generally understood the term "exculpatory." (*Id.* at 46:16–23, 48:19–22.) At her deposition, she initially testified that she was trained to include only the facts that supported removal in a protective custody warrant and was not trained to include exculpatory information. (*Id.* at 49:23–50:7.) After a break, however, she clarified her testimony: "When we first started doing protective custody warrants we were trained on including exculpatory information such as something like that the child is doing well in school. After social workers had been doing—submitting applications for some time, the court basically directed us to just stick to the facts and only include the facts that were in support of removal" because warrant applications were becoming too long. (*Id.* at 51:17–25, 57:9–19.) Cullivan testified that the instructions from the court were orally conveyed to her by a supervisor, but could not remember which supervisor or when she was told. (*Id.* at 52:3–10, 54:8–17.)

Given that Cullivan was a juvenile court investigator and working in a separate unit of CPS, the court questions whether her testimony about the training she received is relevant to plaintiffs' claim that the social workers in the emergency response unit were inadequately trained. In fact, Lake testified that the training for each unit was conducted separately, with social workers in the emergency response unit receiving their training first. (*See* Lake Dep. 52:22–53:7 (testifying that the "training was also staggered so that we tried to focus on the audience to the group that was actually rolling [the new protective warrant policy] out. So the first trainings were really focused to the Emergency Response social workers and the

situations they might encounter .... [The employees] were encouraged to attend [training] with their own colleagues in the program.").) Because juvenile court investigators usually did not seek protective custody warrants, it is likely that their training differed from the separate training provided to social workers in the emergency response unit.

■ Overall, the undisputed testimony from employees familiar with the training provided to social workers in the emergency response unit was that mandatory training was provided and the social workers were instructed to include all relevant evidence in a protective custody warrant. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident," *Canton,* 489 U.S. at 392, 109 S.Ct. 1197, "[b]ut showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick,* 131 S.Ct. at 1363. In light of the testimony from the employees within the emergency response unit, plaintiffs have not established a genuine issue of material fact with respect to the inadequacy of the County's training program on protective custody warrants.

Nonetheless, even assuming plaintiffs submitted sufficient evidence to establish a genuine issue of material fact regarding the inadequacy of Sacramento County's training program to withstand summary judgment, plaintiffs have failed to establish a triable issue of fact whether the alleged constitutional violations at issue in this case were a plainly obvious consequence of the inadequate training program.

Schrage testified that, before an application for a protective custody warrant was submitted to the court, it was the required practice that "all of the relevant facts" are

provided to County counsel and County counsel "reviews our protective custody warrant application in their entirety before they are submitted to juvenile court." (Schrage Dep. 66:19–67:5; *see also* Schrage Dep. 131:25–3 ("I know for a hundred percent that someone from County counsel reviewed this before it went to the court. Nothing goes to the court without being reviewed by County counsel. No protective custody warrant application."), 36:1–7 (testifying that it was the "practice that the program manager was involved with the decision and staffing of County counsel").) She explained, "[i]n practice, County counsel does make recommendations and does ask for additional information and facts if needed before the warrant is submitted to the court." (*Id.* at 67:11–13.) Plaintiffs do not dispute that County counsel reviewed protective custody warrant applications and, in fact, the evidence in the case at hand confirms that County counsel was involved in preparing the PCW through the staffings and review of it. In 2009, social workers were also required to have their supervisors review a protective custody warrant before submitting it to County counsel or the juvenile court. (*Id.* at 123:5–24, 134:16–20.)

In *Connick*, the Court distinguished between the obviousness of a need to train police officers versus district attorneys. The Court first discussed the hypothetical involving police officers where the Court had previously suggested that a failure to train theory might survive in the absence of a pattern of similar violations:

> [A] city [ ] arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens'

rights," . . . a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.

*Connick*, 131 S.Ct. at 1360. In contrast, the Court held that the "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton's* hypothesized single-incident liability" because "[t]he obvious need for specific legal training that was present in the *Canton* scenario is absent [ ]." *Id.* In "stark contrast" to police officers, who cannot be assumed to be familiar with the constitutional constraints on the use of deadly force, the Court reasoned that legal "[t]raining . . . differentiates attorneys from average public employees." *Id.* (internal quotation marks and citation omitted) (alteration in original). The Court concluded, "In light of th[e] regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 1363.

Here, assuming that social workers are akin to police officers and thus cannot be assumed to possess legal knowledge about what information must constitutionally be included in a protective custody warrant, County counsel, like district attorneys, "are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." *Id.* at 1362. Even if the County's training of the social workers was inadequate, the consequences of the training program cannot be assessed in a vacuum. It is undisputed that the County's policy required the social workers to provide County counsel with all relevant evidence and that County counsel participated in the staffings to determine whether a protective custody warrant would be sought and, if it was, County

counsel reviewed the applications prior to its submission to the juvenile court. Given the involvement of County counsel in the decision whether to seek a protective custody warrant and the contents of any application, the County was not on "actual or constructive notice" that a "highly predictable" consequence of its failure to adequately train the social workers in the constitutional requirements of protective custody warrants was that social workers would submit constitutionally deficient applications for protective custody warrants. *See id.* at 1365.

Accordingly, because plaintiffs have failed to establish a genuine issue of material fact that the County's training program on protective custody warrants amounts to deliberate indifference to the rights of individuals like CHD–O, the court will grant defendants' motion for summary judgment on plaintiffs' *Monell* claim.[17]

### 5. *County Counsel's Claim of Absolute Immunity*

 The parties do not dispute that defendants Travis and Guillon served as

---

**17.** Because the court will grant defendants' motion for summary judgment on plaintiffs' *Monell* claims, it need not address DHHS and CPS's argument that they cannot be named as § 1983 defendants. The court notes, however, that defendants' reliance on *United States v. Kama*, 394 F.3d 1236 (9th Cir.2005) is not as straight-forward as defendants suggest. In a concurring opinion in *Kama*, Judge Ferguson stated, "municipal police departments and bureaus are generally not considered 'persons' within the meaning of 42 U.S.C. § 1983." *Kama*, 394 F.3d at 1239–40 (Ferguson, J., concurring). Relying on this language, numerous decisions in this district have held that municipal police and sheriff departments are not proper § 1983 defendants. *See, e.g., Wade v. Fresno Police Dep't*, Civ. No. 1:09–0599 AWI DLB, 2010 WL 2353525, at *4 (E.D.Cal. June 9, 2010); *Brockmeier v. Solano Cnty. Sheriff's Dep't*, Civ. No. 2:05–2090 MCE EFB, 2006 WL 3760276, at *4 (E.D.Cal. Dec. 18, 2006).

The Ninth Circuit, however, has held that police and sheriff departments in California are "separately suable entit[ies]" and thus can be subject to liability under § 1983 when acting for a county or city. *Streit v. County of Los Angeles*, 236 F.3d 552, 565 (9th Cir.2001) (Los Angeles County Sheriff's Department); *see also Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 604–05 (9th Cir. 1986) (San Jose Police Department) In *Streit* and *Shaw*, the Ninth Circuit began its analysis by explaining that, "[u]nder Rule 17(b) of the Federal Rules of Civil Procedure, the Police Department's capacity to be sued in federal court is to be determined by the law of California." *Streit*, 236 F.3d at 565 (quoting *Shaw*, 788 F.2d at 604) (internal quotation

marks omitted). The court then looked to California Government Code section 945, which provides that "[a] public entity may sue and be sued," and section 811.2, which defines "public entity" to include "the state, the Regents of the University of California, the Trustees of the California State University and the California State University, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State." *Id.* The Ninth Circuit then relied on a California Supreme Court decision holding that a police department is a public entity under the California Evidence Code to find that "the courts of California would hold that the Police Department is a public entity under section 811.2." *Id.* (quoting *Shaw*, 788 F.2d at 604) (internal quotation marks omitted).

When stating that "municipal police departments and bureaus are generally not considered 'persons' within the meaning of 42 U.S.C. § 1983" in *Kama*, Judge Ferguson cited to an Eleventh Circuit decision that affirmed dismissal of claims against a county sheriff department. *See Kama*, 394 F.3d at 1240 (citing *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir.1992)). In *Dean v. Barber*, the Eleventh Circuit emphasized, "The question here is not whether the Jefferson County Sheriff's Department is a 'person' for the purposes of liability under *Monell* and section 1983, but whether the Department is a legal entity subject to suit." *Dean*, 951 F.2d at 1214. The court concluded that, because "a county sheriff's department lacks the capacity to be sued" *under Alabama law*, it could not be sued under § 1983. *Id.* at 1215.

County counsel for Sacramento County at all times relevant to this case and that Travis was Guillon's supervisor. The TAC alleges, and Travis and Guillon do not dispute,[18] that a "staffing" occurred on January 5, 2009, at which Lopez, Fera, and Travis discussed how to proceed with the case and decided to seek a protective custody warrant for CHD–O. (Cnty. Counsel's Stmt. of Undisputed Facts No. 16 (Docket No. 129).) The TAC further alleges that Travis and Guillon participated in a second staffing on January 22, 2009, at which the decision to seek a protective custody warrant for the removal of CHD–O was affirmed. (Id. No. 18.) At that staffing, the content of the protective custody warrant for CHD–O was discussed and decisions were made about what to include or omit from the warrant. (Id.) Travis and Guillon do not dispute that Guillon also participated in drafting the PCW for CHD–O, but did not sign it. (Id. No. 19 (citing Guillon Dep. 63:23–64:14).)

 Travis and Guillon contend that they are entitled to absolute immunity for Travis's participation in the January 5, 2009, staffing, their participation in the January 22, 2009, staffing, and Guillon's participation in drafting the PCW for the removal of CHD–O. "The burden to establish absolute immunity rests on the defendant who wishes to use it as a defense, and the 'presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'" *Lacey v. Maricopa County,* 649 F.3d 1118, 1126 (9th Cir.2011).

The Ninth Circuit has held that, based on the similarity in the functions performed by social workers to the functions performed by prosecutors, "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.,* 812 F.2d 1154, 1157 (9th Cir.1987). In the same decision, however, the Ninth Circuit held that absolute immunity does not apply to social workers' actions that "preceded the institution of judicial proceedings." *Id.* at 1155. More recently, the Ninth Circuit clarified that social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury." *Beltran v. Santa Clara County,* 514 F.3d 906, 908 (9th Cir.2008) (per curiam). Analogizing the functions performed by social workers to those of prosecutors, the court explained that a "prosecutor doesn't have absolute immunity if he fabricates evidence during a preliminary investigation, before he could properly claim to be acting as an advocate" and, "as prosecutors and others investigating criminal matters have no absolute immunity for their investigatory conduct, a fortiori, social workers conducting investigations have no such immunity." *Id.* at 908–09.

In a prior order granting plaintiffs' motion to file the TAC, this court rejected the social worker defendants' claim that they were entitled to absolute immunity for their participation in the January 22, 2009, staffing. This court explained that the

---

**18.** In their statement of undisputed facts, Travis and Guillon identify allegations from the TAC and request that the court take judicial notice of the TAC. In response, plaintiffs indicate that they do not dispute the allegations. It is unclear whether Travis and Guillon are indicating that they do not dispute the allegations in the TAC that they identify in their statement of undisputed facts or request that, for purposes of their motion for summary judgment, the court simply assume those allegations to be true. The court will do the latter and assume, for purposes of this motion alone, that the allegations in the TAC discussed in this section are undisputed.

misconduct by the participants of the January 22, 2009, staffing "preceded the institution of judicial proceedings," *Meyers*, 812 F.2d at 1155, and, because the participants in the staffing allegedly made decisions to omit material information or include material misrepresentations, it was not the type of function for which social workers are entitled to absolute immunity under *Beltran*. *See Beltran*, 514 F.3d at 908; *see also Beltran*, 389 Fed.Appx. at 680–81 (applying only qualified immunity to claims that social workers submitted a petition containing material misrepresentations and omissions in support of a warrant to take custody of a minor child).

In the order granting leave to file the TAC, the parties did not address Travis and Guillon's immunity, and thus the court expressly refrained from doing so. In now asserting absolute immunity, Travis and Guillon simply ignore *Beltran*'s limitation of absolute immunity available to social workers and argue they are entitled to absolute prosecutorial immunity. Aside from the fact that they were serving as County counsel, however, it is hard to distinguish Travis and Guillon's participation in the staffings and Guillon's participation in drafting the PCW from Lopez and the other social workers.

The Supreme Court has repeatedly emphasized that absolute immunity "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *see Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir.2010) ("Interpreting the Supreme Court's decision in *Kalina v. Fletcher*, 522 U.S. 118, 127–29, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), we recently reaffirmed that it is only the specific function performed, and not the role or title of the official, that is the touchstone of absolute immunity." (internal quotation marks omitted)). "When determining whether a particular action qualifies as prosecutorial, the court looks at 'the nature of the function performed, not the identity of the actor who performed it.'" *Lacey*, 649 F.3d at 1127 (quoting *Kalina*, 522 U.S. at 127, 118 S.Ct. 502). In participating in the staffings and drafting of the PCW, Travis and Guillon were essentially serving the same function as social workers and the court therefore finds it likely that they too would be limited to claiming qualified immunity under *Beltran*.

Moreover, even assuming that, as County counsel, Travis and Guillon were serving a function distinct from the social workers and therefore would not be precluded from asserting absolute immunity under *Beltran*, their claim to absolute immunity would still fail. "A prosecutor is entitled to absolute immunity from a civil action for damages when he or she performs a function that is 'intimately associated with the judicial phase of the criminal process.'" *Ewing*, 588 F.3d at 1232 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). "However, the functions of an advocate do not include advising police officers whether probable cause exists during their pretrial investigation and fabricating evidence before probable cause has been established." *Id.* at 1233 (internal citations omitted).

In *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), the Court held that a prosecutor was entitled only to qualified immunity when he advised police that probable cause existed to arrest the plaintiff. *Burns*, 500 U.S. at 496, 111 S.Ct. 1934. The Court explained,

Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Ironically, it would mean that the police,

who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not.

*Id.* at 495, 111 S.Ct. 1934. In light of *Burns,* the Ninth Circuit has emphasized that "[t]he Supreme Court has clearly stated that with respect to advising police, prosecutors are entitled to qualified not absolute immunity." *Ewing,* 588 F.3d at 1233.

Travis and Guillon did not address *Burns* and the limited immunity prosecutors receive when advising police. The court does not see, however, how the function served in participating in the staffings or drafting the PCW was anything but advising the social workers about whether probable cause existed for the removal of CHD–O and what information should be included or excluded to facilitate a finding of probable cause. Accordingly, Travis and Guillon have failed to show that they are entitled to absolute immunity for participation in the staffings or drafting of the PCW, and the court must therefore deny their motion for summary judgment based on absolute immunity.

### 6. *Intentional Infliction of Emotional Distress Claims*

#### a. *Lopez and Solla's December 19, 2008, Interviews*

In their sixth claim, plaintiffs assert state law intentional infliction of emotional distress ("IIED") claims against Lopez and Solla based on their interviews of the minor children plaintiffs on December 19, 2008. Defendants claim Lopez and Solla are immune from the IIED claims under California Government Code sections 820.2 and 821.6.

██ California Government Code section 820.2 provides, "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission

was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. "To determine which acts are discretionary, California courts do not look at the literal meaning of 'discretionary,' because '[a]lmost all acts involve some choice between alternatives.'" *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1379 (9th Cir.1998) (quoting *Caldwell v. Montoya,* 10 Cal.4th 972, 981, 42 Cal.Rptr.2d 842, 897 P.2d 1320 (1995)). "Rather, immunity protects 'basic policy decisions,' but does not protect 'operational' or 'ministerial' decisions that merely implement a basic policy decision." *Id.*

Here, defendants rely on California Department of Social Services Regulations 31–125.1 and 31–125.23 as vesting social workers with discretion in investigating allegations of child abuse. Regulation 31–125.1 provides:

> The social worker initially investigating a referral shall determine the potential for or the existence of any conditions(s) which places the child, or any other child in the family or household, at risk and in need of services and which would cause the child to be a person described by Welfare and Institutions Code Sections 300(a) through (j).

Regulation 31–125.23 provides:

> If as a result of the investigation the social worker has determined the referral is not unfounded, and has completed the requirements in Section 31–125.22 and documented the results in the case record, the decision whether to conduct an in-person investigation with any additional children who were not present at the initial in-person investigation shall be at the discretion of the county.

██ The California Supreme Court has explained that "classification of the act of a public employee as 'discretionary' will not produce immunity under section 820.2 if

the injury to another results, not from the employee's exercise of 'discretion vested in him' to undertake the act, but from his negligence in performing it after having made the discretionary decision to do so." *McCorkle v. City of Los Angeles,* 70 Cal.2d 252, 261, 74 Cal.Rptr. 389, 449 P.2d 453 (1969). In *McCorkle,* the California Supreme Court held that, even if a police officer "exercised his discretion in undertaking his investigation" of an accident, "section 820.2 did not clothe him with immunity from the consequences of his negligence in conducting it." *Id.* The court explained:

> [The officer] would have been immune if plaintiff's injury had been the *result* of [the officer's] exercise of discretion. It was not: it resulted from his negligence after the discretion, if any, had been exercised. Because the essential requirement of section 820.2—a causal connection between the exercise of discretion and the injury—did not exist, the statutory immunity does not apply.

*Id.*

Similarly, in *Barner v. Leeds,* 24 Cal.4th 676, 102 Cal.Rptr.2d 97, 13 P.3d 704 (2000), the California Supreme Court held that, even if the decision whether to appoint a public defender is a discretionary decision and "even though a deputy public defender's actual representation of a client requires the exercise of considerable skill and judgment, such representation generally does not involve discretionary acts within the meaning of section 820.2." *Barner,* 24 Cal.4th at 688, 102 Cal.Rptr.2d 97, 13 P.3d 704. The court thus concluded that section 820.2 did not immunize a public defender's alleged negligent misrepresentation because his "services consist of operational duties that merely implement the initial decision to provide representation and are incident to the normal functions of the office of the public defender." *Id.*

In contrast to *McCorkle* and *Barner,* the Third District Court of Appeal more recently held that section 820.2 immunized a social worker from a claim that the social worker performed an *"inadequate* investigation." *Ortega v. Sacramento Cnty. Dep't of Health & Human Servs.,* 161 Cal. App.4th 713, 732, 74 Cal.Rptr.3d 390 (3d Dist.2008). In *Ortega,* the arrest of the child's father mandated the social worker to perform a particular investigation, but the social worker failed to gather the enumerated sources in the CPS handbook, and defendants conceded that the social workers' investigation was " 'lousy' " and ultimately resulted in the social worker making the wrong determination about returning the child to the custody of her father. *Id.* at 728, 731, 74 Cal.Rptr.3d 390. The court nonetheless concluded that the social worker was immune under section 820.2 because she "made a considered decision balancing risks and advantages," even though she did so based on "woefully inadequate information." *Id.*

Other courts have also taken a more expansive view than *McCorkle* in extending section 820.2 immunity to allegedly inadequate or negligent investigations by social workers. *See, e.g., Jacqueline T. v. Alameda Cnty. Child Protective Servs.,* 155 Cal.App.4th 456, 66 Cal.Rptr.3d 157 (1st Dist.2007) (granting immunity under sections 820.2 and 821.6 for the "failure to conduct a reasonable and diligent investigation"); *Alicia T. v. County of Los Angeles,* 222 Cal.App.3d 869, 882, 271 Cal.Rptr. 513 (2d Dist.1990) (rejecting plaintiffs' argument that "the investigative nature of a social worker's employment is ministerial and not discretionary"); *Guzman v. County of Alameda,* Civ. No. 10–2250 MEJ, 2010 WL 3702652, at *8 (N.D.Cal. Sept. 10, 2010) ("[C]ourts have recognized immunity for social workers in their investigations of child abuse complaints."); *Clarke v. Upton,* Civ. No. 1:07–888 OWW SMS, 2008 WL

2025079, at *17 (E.D.Cal. May 9, 2008) ("The immunity set forth in Section 820.2 applies to claims of negligent and intentional conduct alleged in connection with a child abuse investigation ; . . .").

In *Newton v. County of Napa*, 217 Cal. App.3d 1551, 266 Cal.Rptr. 682 (1st Dist. 1990), the court similarly held that section 820.2 provided immunity for claims for " 'failing to properly, thoroughly and completely investigate the source and basis for the underlying [child abuse] complaint,' " but "did not extend[ ] 'beyond actions implied in the decision to investigate' to 'gratuitous actions, unnecessary for a proper investigation.' " *Jacqueline T.*, 155 Cal. App.4th at 467–68, 66 Cal.Rptr.3d 157 (quoting *Newton*, 217 Cal.App.3d at 1561– 62, 266 Cal.Rptr. 682) (alteration in original). The *Newton* court explained that the immunity "must embrace further actions necessary to make a meaningful investigation, but it does not exclude the possibility of tortious conduct in making the investigation." *Newton*, 217 Cal.App.3d at 1561, 266 Cal.Rptr. 682. Thus, "the county was [ ] not immune for such gratuitous actions as causing the minors to disrobe and stand naked in the presence of strangers and failing to seek or receive voluntary consent to disrobe them." *Jacqueline T.*, 155 Cal. App.4th at 467–68, 66 Cal.Rptr.3d 157 (citing *Newton*, 217 Cal.App.3d at 1562 & n. 5, 266 Cal.Rptr. 682).

■ The Ninth Circuit has recognized that section 820.2 "applies to county social workers engaged in investigating allegations of child abuse." *Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir.2000). Citing *Newton*, the court has explained that the "immunity provides complete protection for the decision to investigate . . . and for actions necessary to make a meaningful investigation[, but] does not extend[ ] to non-discretionary actions or to at least some intentional torts committed in the course of making the investigation, such as

battery and false imprisonment." *Id.* at 1145

■ Here, plaintiffs' IIED claim is neither based on Lopez's and Solla's decisions to conduct the interviews on December 19, 2008, nor on any allegations of negligence in performing their investigation. It is limited to Lopez's and Solla's alleged failures to obtain consent to conduct the interviews and their use of coercive interview techniques. Although courts have applied section 820.2 broadly to social workers' investigations, extending immunity under the facts of this case would be hard to reconcile with *McCorkle, Barner,* and *Newton.* Nor have defendants articulated how Lopez and Solla, in allegedly coercing interviews of the children, "made a considered decision balancing risks and advantages." *See Ortega,* 161 Cal.App.4th at 733, 74 Cal.Rptr.3d 390. To the contrary, even assuming Lopez's and Solla's decisions to perform the interviews constituted an exercise of discretion, their alleged decisions to do so without consent and through coercive techniques cannot be deemed a discretionary decision under section 820.2. Lopez and Solla are therefore not immune from plaintiffs' IIED claim under section 820.2.

■ Defendants next contend that California Government Code section 821.6 immunizes Lopez and Solla from plaintiffs' IIED claim. Section 821.6 provides, "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." "For purposes of this immunity provision, investigations are deemed to be part of judicial and administrative proceedings." *Strong v. State,* 201 Cal.App.4th 1439, 1461, 137 Cal.Rptr.3d 249 (2d Dist. 2011); *accord Blankenhorn v. City of Orange,* 485 F.3d 463, 488 (9th Cir.2007).

Courts have repeatedly applied immunity under section 821.6 to social workers' conduct during investigations. *See Jacqueline T.*, 155 Cal.App.4th at 468, 66 Cal. Rptr.3d 157; *Alicia T.*, 222 Cal.App.3d at 883, 271 Cal.Rptr. 513; *Jenkins v. County of Orange*, 212 Cal.App.3d 278, 283–85, 260 Cal.Rptr. 645 (4th Dist.1989); *see also Asgari v. City of Los Angeles*, 15 Cal.4th 744, 756–57, 63 Cal.Rptr.2d 842, 937 P.2d 273 (1997) ("Although Government Code section 821.6 has primarily been applied to immunize prosecuting attorneys and other similar individuals, this section is not restricted to legally trained personnel but applies to all employees of a public entity." (internal quotation marks and citations omitted)). Plaintiffs have not cited any authority demonstrating why allegations of coercion would preclude immunity under section 821.6's broad grant of immunity and, in fact, the Ninth Circuit has recognized that the immunity has been extended to analogous conduct. *See Blankenhorn*, 485 F.3d at 488 (citing a California appellate case granting immunity under section 821.6 for "taking rape and attempted murder victim against her will to the crime scene and later telling neighbors that she was lying about what happened").

Plaintiffs nonetheless contend that California Government Code section 820.21 precludes Lopez and Solla from receiving immunity under section 821.6. Section 820.21 provides:

(a) Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code shall not extend to any of the following, if committed with malice:

(1) Perjury.

(2) Fabrication of evidence.

(3) Failure to disclose known exculpatory evidence.

(4) *Obtaining testimony by duress*, as defined in Section 1569 of the Civil Code, fraud, as defined in either Section 1572 or Section 1573 of the Civil Code, or *undue influence*, as defined in Section 1575 of the Civil Code.

Based on the court's prior findings that plaintiffs established a genuine issue of material fact with respect to whether DeRose consented to the interviews of the minors on December 19, 2008, section 820.21(a)(4) could potentially limit Lopez's and Solla's immunity if the statements contained through the interviews at the Olvera/DeRose home constitute "testimony" under section 820.21.

Section 820.21 does not define "testimony" and neither party cited any authority shedding light on its definition in that section. The general definition of "testimony" suggests that the statements must be made under oath or affirmation, such as would occur during a trial or deposition. *See* Black's Law Dictionary (9th ed. 2009) (defining "testimony" as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition"). The other enumerated conduct in which the social worker could lose immunity under section 820.21 (perjury, fabrication of evidence, and failure to disclose exculpatory evidence) also suggests that the section was intended to extend to conduct occurring during or after the initiation of judicial proceedings.

The Legislative Analyses explain that one of the primary reasons for enacting section 820.21 was concern that social workers' immunity was too expansive, *see, e.g.,* S. Rules Comm., Comm. Analysis of AB 1355 (Sept. 8, 1995), but they do not

discuss the intended definition of "testimony." The amendments to the bill that enacted section 820.21, however, suggest that the Legislature intended the section to cover only conduct closely-related with the judicial process. As initially introduced, AB 1355 proposed to limit social workers' immunity to "be the same as the civil immunity provided by law to peace officers," which would have provided social workers with only qualified immunity. AB 1335 (Feb. 23, 1995). After amendment in the Senate on August 25, 1995, the bill proposed to preclude immunity for "(a) Offering perjured testimony. (b) Fabrication of evidence. (c) Knowingly failing to disclose exculpatory evidence. (d) Coercion of any party to the investigation or proceeding. [and] (e) Initiating or conducting an investigation or proceeding to achieve or gain a personal advantage or profit." Here, the proposed subsection (d) would have more clearly extended to the interviews in this case. In the third and final amendment by the Senate less than two weeks later, "coercion of any party to the investigation or proceeding" was removed, the malice requirement was added, and the categories of conduct were limited to the four categories ultimately enacted in section 820.21. These amendments suggest that, while AB 1335 initially posed a drastic limitation on social workers' immunities, the Legislature continued to limit the scope of the bill with it ultimately extending only to conduct traditionally associated with the judicial process. The court therefore finds that "testimony" in section 820.21 was not intended to include in-home interviews that were neither under oath or in connection with an on-going judicial proceeding.

Accordingly, because Lopez and Solla are entitled to immunity under section 821.6 for their alleged coercive conduct during the interviews on December 19, 2008, the court must grant defendants' motion for summary judgment on plaintiffs' IIED claim against those defendants.

### b. Robin Rogers Requiring Children to Appear in Juvenile Court

■ In their opposition, plaintiffs clarify that their seventh claim for IIED is alleged by all plaintiffs except Morrison and Miess and against only Robin Rogers based on her demand that the minor children plaintiffs repeatedly pack their bags and appear in juvenile court under the threat that they could be removed if they failed to appear. (Pls.' Opp'n to Cnty.'s Mot. at 97:8–16.)

■ The elements for the tort of intentional infliction of emotional distress are "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior Court,* 54 Cal.3d 868, 904, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991) (internal quotation marks and citation omitted). Because defendants initially limited their request for summary judgment on this claim to arguing that they were immune, their opening briefs did not address the merits and plaintiffs' opposition relating to the merits is minimal at best. For the first time in their reply, defendants appear to abandon any claim of immunity and address the merits of the claim.

Although both parties raise pro forma arguments about whether Rogers' alleged conduct could satisfy the first two elements of an IIED claim, neither party

cites any case law. As the party carrying the initial burden, defendants also fail to cite a single case in support of an argument that Rogers' alleged conduct cannot give rise to an IIED claim as a matter of law. With the limited factual development of the claim and lack of any authority suggesting the claim can be resolved as a matter of law, the court finds that defendants have failed to carry their initial burden in seeking summary judgment and will deny defendants' motion for summary judgment on the seventh claim with respect to Rogers and, in light of plaintiffs' clarification, will grant defendants' motion for summary judgment on the seventh claim with respect to all other defendants.

IT IS THEREFORE ORDERED that:

(1) plaintiffs' motion to appoint DeRose as guardian ad litem for plaintiffs AND–O, CHD–O, COD–O, SD–O, AGD–O, GD–O, and RD–O *nunc pro tunc* to the date this action was filed be, and the same hereby is, GRANTED;

(2) plaintiffs' fifth claim under § 1983 against all defendants based on violations of plaintiffs' First Amendment rights of association and all claims against Fermine Perez, Laura Coulthard, Lynn Frank, Joni Edison, Keeva Pierce, Stephanie Lynch, Veronica Carrillo, Fred Demartin, Kim Pearson, Patti Gilbert–Driggs, and Melinda Lake be, and the same hereby are, DISMISSED with prejudice;

(3) defendants' motion for summary judgment on the first claim under § 1983 for violation of the Fourth Amendment against Lopez and Solla be, and the same hereby is, DENIED;

(4) defendants' motion for summary judgment on the eighth claim under § 1983 for violation of the Fourth Amendment be, and the same hereby is, DE-NIED as to Christian and GRANTED as to all remaining defendants;

(5) defendants' motion for summary judgment on the third and fourth claims under § 1983 for violations of plaintiffs' rights to familial association be, and the same hereby is, GRANTED;

(6) defendants' motion for summary judgment on CHD–O's second claim under § 1983 for a violation of his Fourth Amendment rights be, and the same hereby is, GRANTED as to all defendants except Lopez, Schrage, Travis, and Guillon;

(7) County of Sacramento, DHHS, and CPS's motion for summary judgment on all *Monell* claims be, and the same hereby is, GRANTED:

(8) Travis and Guillon's motion for summary judgment on the ground of absolute immunity relating to the staffings and drafting of the PCW be, and the same hereby is, DENIED;

(9) defendants' motion for summary judgment on the sixth claim for IIED be, and the same hereby is, GRANTED; and

(10) defendants' motion for summary judgment on the seventh claim for IIED be, and the same hereby is, DENIED as to Rogers and GRANTED as to all remaining defendants.